Judge EFFRON
delivered the opinion of the Court.
A general court-martial composed of officer members convicted appellant, contrary to his pleas, of one specification of disrespect toward a superior officer and six specifications of conduct unbecoming an officer, in violation of Articles 89 and 133, Uniform Code of Military Justice, 10 USC §§ 889 and 933. He was sentenced to dismissal and confinement for 14 days. The convening authority approved these results, and the Court of Criminal Appeals affirmed in an unpublished opinion.
On appellant’s petition, we granted review of the following issues:
I
WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN DENYING APPELLANT’S REQUEST FOR A SPECIAL INSTRUCTION TO ENSURE A PROPER VERDICT BY A VOTE OF TWO-THIRDS OF THE MEMBERS.
II
WHETHER THE MILITARY JUDGE ERRED BY ADMITTING AIR FORCE PAMPHLET 36-2705 (“DISCRIMINATION AND SEXUAL HARASSMENT”) WHICH PREJUDICIALLY INVITED THE MEMBERS TO CONSIDER OFFICIAL “AIR FORCE POLICY” IN ADJUDGING FINDINGS AND SENTENCE. ■ ■
III
WHETHER VARIOUS SPECIFICATIONS OF CHARGE II AND THE ADDITIONAL CHARGE ARE SUPPORTED BY LEGALLY INSUFFICIENT EVIDENCE. We hold that the military judge did not err with respect to Issue II. With respect to Issue III, concerning the legal sufficiency of the evidence, we affirm in part and reverse in part for the reasons set forth below. Issue I is moot in light of our disposition of Issue III.
I. BACKGROUND
This case involves the relationships among four Air Force nurses — appellant, Captain (Capt) TT, Capt LK, and First Lieutenant (lLt) VC. At the time of the incidents at issue, the four nurses were assigned to the 42nd Medical Group, Maxwell Air Force Base (AFB), Alabama. Appellant was serving in the grade of captain as an operating room nurse and assistant supervisor of the operating room. He was married, had one child, and had served nearly 10 years on active duty, including 6 years of service as a commissioned officer in the Air Force. Capt TT, a female nurse with 4 years of service, also worked in the operating room. Capt TT was a First Lieutenant for most of the period during which she worked with appellant and was promoted near the end of the period encompassing the charges. Appellant was her assistant supervisor throughout most of this period. Capt LK, a female nurse anesthetist on her first assignment in the Air Force, worked in the operating room. lLt VC, a female nurse also on her first assignment, initially worked on the Medical Surgical Floor and subsequently was assigned to the operating room.
Capt TT met appellant when she was assigned to the operating room in April 1995. Approximately 10 months later, she mentioned to the operating room supervisor, Lieutenant Colonel (Lt Col) B, that appellant had made personal comments that she considered to be offensiye. The record is unclear as to precisely when Capt TT brought this matter to Lt Col B’s attention. Lt Col B responded by discussing the following options with Capt TT: he could address the situation in his supervisory capacity or he could allow Capt TT to handle it by herself. According to Lt Col B, he offered Capt TT the option of addressing the matter informal *377 ly on her own because he thought that “maybe they were just having a personality problem.” Neither Capt TT nor Lt Col B treated this as a formal complaint requiring official action, and neither brought these concerns to appellant’s attention.
In March 1996, appellant had a discussion with Capt TT and other operating room personnel regarding the procedure for counting medical instruments. Appellant noted that Capt TT had made an incorrect count on the previous evening, and reminded everyone present of the accountability procedure required by hospital policy. Capt TT, who believed that her counting method was superior, was embarrassed because appellant singled her out for criticism. She became defensive and asked appellant to discuss the issue in private. The conversation escalated into a shouting match.
Soon thereafter, on March 22, Capt TT decided to call upon Lt Col B and provide him with the details of her personal interactions with appellant over the past 10 months, but he was not in his office. She then returned to the recovery room and had a conversation with lLt VC, the substance of which is a matter of dispute. Capt TT testified that lLt VC initiated a conversation about appellant, asking, “How can you stand to work with him?” lLt VC specifically contradicted Capt TT’s recollection. lLt VC denied making the remark, and instead expressed her belief that Capt TT was prompted to approach her as a result of the dispute over counting medical instruments. Both agree, however, that they discussed appellant’s conduct. The two nurses then met with Lt Col B and related incidents during the past year that they viewed as inappropriate. Neither Capt TT nor lLt VC advised Lt Col B, at that time, of the dispute concerning the medical instruments. Capt TT also had a separate conversation with Lt Col B during which she advised him that appellant, an African-American, had accused Lt Col B, a Caucasian, of racism.
As a result of his conversation with Capt TT and lLt VC about their interaction with appellant, Lt Col B became concerned that they had raised a sensitive issue for the Air Force and the Department of Defense that was “out of [his] league” and that had to be addressed “in light of Air Force policies on harassment.” He reported his concerns to higher authorities, which resulted in a formal investigation.
In the meantime, Lt Col B learned of the dispute about counting medical instruments. He met with appellant on March 28 to discuss that dispute and an unrelated staffing matter. He did not mention the information he had received from Capt TT and lLt VC about their personal interaction with appellant. According to Lt Col B, appellant remained calm throughout the conversation. Twenty minutes later, however, appellant returned and called Lt Col B a racist, complained that Lt Col B was soliciting lies about him, and threatened to file a complaint with the Inspector General.[1]
At about 5:45 a.m. the next morning, appellant asked Lt Col B if he could go home early because he had worked the previous night. Lt Col B told him he could not leave at that time. Appellant returned shortly thereafter and advised Lt Col B that his wife and child had been in a car accident during the night and that he needed to go home. Lt Col B again told him he could not leave. At this point, appellant became upset and began to yell at Lt Col B. Lt Col B started to escort appellant to his office and ordered him to stop talking. Appellant complied. While waiting for the elevator, appellant said, three times, “I’m not your nigger boy.” Lt Col B, appellant, and a witness to this remark then went directly to the Commander’s office without further incident. When asked by the Commander if Lt Col B had ever overtly discriminated against him or uttered racial slurs, appellant replied that Lt Col B had not.
Appellant subsequently was charged with and convicted of disrespect toward Lt Col B *378 under Article 89 and with conduct unbecoming an officer under Article 133 for his interaction with the other nurses. The issues raised by appellant in the present appeal pertain to the Article 133 charges and do not challenge his conviction for disrespect to Lt Col B.
APPELLANT’S INTERACTION WITH HIS COLLEAGUES
1. Appellant’s Interaction With lLt VC
lLt VC met appellant in February 1995, during a 3-day CPR-Instructor course she attended shortly after she arrived at the hospital. According to lLt VC, appellant sat next to her on 2 of the 3 days. He made complimentary remarks about her appearance, and asked her a number of questions, including where she was from, whether she had a boyfriend, whether she worked out, how much she weighed, and what type of men she liked.[2] She stated that during these conversations, he touched her hair and the top of her kneecap.[3] Other than moving away from his touch, she did not manifest concern about his remarks or conduct.
At the time of the CPR course, lLt VC and appellant worked in different sections of the hospital. A year later, in March 1996, she was transferred to appellant’s section of the hospital, the operating room. According to lLt VC, appellant made several comments that she viewed as inappropriate, including a statement that her supervisor, Lt Col B, was a racist.[4] She did not respond to him or speak to anyone else about these comments.
Subsequently, lLt VC was approached by another operating room nurse, Capt TT, who asked her if anyone had made her uncomfortable. She told Capt TT about appellant’s behavior at the CPR course the year before and the two then met with Lt Col B.
Although lLt VC later testified that appellant’s behavior made her feel “uncomfortable” and that she found it “inappropriate,” she did not communicate these feelings to him, nor did she tell anyone else about appellant’s conduct. According to her testimony, she did not feel that appellant was attempting to become sexually intimate with her. She added that appellant’s manner of communicating involved standing very close to people when he talked, and that it was his habit to touch people when he talked to them. She viewed this as an invasion of her private space, which made her uncomfortable. She stated that she had not told anyone about her interaction with appellant at the CPR course because “I was afraid to. I was new here. He was a captain; I was just a second lieutenant. I didn’t see him any more. I had no more contact with him.”
Although lLt VC testified that she viewed appellant’s style of communication, which included touching, to be inappropriate, she emphasized that she did not view his actions towards her as sexual harassment, as morally unfitting, or as criminal conduct. She added that in her view, the matter had been blown out of proportion.
2. Appellant’s Interaction with Capt LK
Capt LK arrived at Maxwell AFB in January 1996. Shortly thereafter, appellant offered to show her around town. A month later, Capt LK ran into appellant and his family at a Black History Festival. The next day, appellant called Capt LK, and she agreed to join him on a sightseeing tour. On the tour, which included lunch, appellant asked her what kind of men she liked. On the trip home, appellant put his hand on Capt LK’s leg above the right knee. She did not respond, but she asked him to take her *379 home so she could pick up her daughter at school. On a subsequent occasion, when they were together outside the operating room, appellant touched her face with the back of his hand. Capt LK also testified that appellant made various comments to her at work, such as telling her he “was coming over” to her house, she looked fit, and asking her several times what kind of men she liked.[5]
Capt LK testified that despite feeling uncomfortable when appellant put his hand on her knee, she never made him aware of this. She testified that his offer to go sightseeing did not offend her because it reflected customary interaction with new arrivals, nor did she find his comments on fitness to be inappropriate. Although she found other remarks by appellant to be inappropriate and unprofessional, she did not tell appellant that she had any concerns about his comments, nor did she communicate any concerns to other officers or the chain of command. She testified that she believed she could handle any concerns that she had about appellant by herself. Typically, she reacted to his remarks by responding in kind. For example, when he said “I’m coming over,” she replied that she would tell his wife where “to pick up her stray dog.”
In late March, Capt TT called Capt LK to ask whether anyone had ever made her feel uncomfortable at work. When she named appellant, Capt TT informed Capt LK that security police would be in touch with her.
3. Appellant’s Interaction with Capt TT
When Capt TT arrived at Maxwell AFB in April 1995, she was the only female nurse assigned to the operating room. She worked directly with appellant from June 1995 until March 1996. Capt TT testified that she felt uneasy from the moment she met him because of the way he looked at her body, although she did not mention it to appellant or anyone else during this period. She and appellant had numerous discussions of a personal nature during the period in which they worked together. In June 1995, they discussed their families while sitting next to each other in an operating room. According to Capt TT, appellant asked if she was happily married, winked in a “sort of joking” fashion, and put his hand on top of her thigh, toward the inside. She did not say anything, but she brushed his hand off, stood up, and walked away. She testified that she was “a little bit flabbergasted” by the touch, but not angry.[6]
Capt TT testified that on a separate occasion in June 1995, she walked into the operating room lounge while appellant and several others were talking and eating lunch. According to Capt TT,
they were talking about Hollywood and about California and about people having affairs — extramarital affairs. And I sat down with my food, and Captain Brown looked over at me and said, “Have you ever had an affair?” And I said, “No, I’m not that kind of girl, and why are you such a nibby guy?”[7]
She testified that the question embarrassed her and that she finished her lunch quickly and left the room while the others continued the conversation.
According to Capt TT, she and appellant subsequently were engaged in a conversation, in either June or July 1995, that covered a number of topics, including families and exercise. During that conversation, appellant, who had previously shown Capt TT a picture of his daughter, asked to see a picture of Capt TT’s daughter. After viewing the picture, appellant asked her a number of questions, including her clothing size, whether she wore the same size clothing as her daughter, and whether she worked out. He *380 then commented on her appearance and said that he could tell she worked out. Capt TT later testified that she considered his question about her size to be inappropriate, but she did not express any concern to him at the time.
During this same period, appellant had a number of conversations with Capt TT during which he put his hand on her shoulder.[8] In August 1995, Capt TT decided to inform appellant of her discomfort with the touching. She did so in the course of a casual conversation by raising the topic of sexual harassment and telling appellant that at her previous base, a doctor had been “kicked out” of the Air Force for molesting a patient and sexual harassment. She then told appellant, “By the way, I don’t like the way you touch me sometimes.” Capt TT testified that when appellant replied that he did not know this bothered her, she confirmed that it did and that it made her uncomfortable.[9] Although Capt TT testified that she expressed her concern to appellant about the touchings, she did not advise appellant of any concern she might have had about the remarks he had made.
Shortly after this conversation, appellant touched Capt TT’s right buttock while they were standing side-by-side interviewing a patient. Capt TT initially characterized the touch as a “soft squeeze,” but agreed on cross-examination that it was “a touch.” Afterward, appellant softly said he was sorry. As appellant walked away, she twice said in a lowered voice, “Don’t do that again.” She could not be certain whether appellant heard her.[10]
Capt TT testified that another touching incident occurred in October 1995. While interviewing a patient together, appellant reached in front of Capt TT for part of the medical record and, in the course of doing so, his hand and forearm brushed her breast. Capt TT backed up and “[g]ave him a really hateful look” and appellant apologized. She testified that she thought the contact may have been accidental and acknowledged on cross-examination that people often worked “elbow to elbow” in the operating room and that accidental contact could occur.[11]
Capt TT testified about several other conversations with appellant. On one occasion, Capt TT entered the operating room lounge while appellant and others were engaged in a discussion about the sexual practices of the popular entertainer, Madonna:
We were all in the OR [operating room] lounge, and there was a bunch of people— a group of people in there again during break. And there was a magazine there— a picture front magazine cover was of Madonna, ... and they were talking about — I guess she has a video and a book, and Madonna — I don’t know; I’ve not seen it— but that Madonna masturbates, and they were talking about it. And Captain Brown looked at me and said, “Do women masturbate?” And I looked at a person sitting next to me, and I said, “Not the girls I know,” or something to [sic] that sort.
Capt TT testified that conversations of a sexual nature were not unusual at work at that time.
In the fall of 1995, Capt TT was in the operating room lounge, showing another person a picture of her daughter, when appellant asked what size pants she wore. According to Capt TT, she made a “sarcastic” response and asked rhetorically, “Are you writing another book?” Appellant then replied “I’m sure other people have told you how nice looking you are.” Capt TT testified that in response, she “walked him off. Just walked away.”
In January 1996, Capt TT was having a conversation with Lt Col B about an upcoming vacation in Florida when appellant asked whether she liked to go in the ocean and whether she wore a one or two-piece swim *381 suit. She asked him why he wanted to know, and he replied that he guessed she wore a two-piece suit. When asked about Lt Col B’s reaction to these comments, Capt TT said that Lt Col B “didn’t respond to it at all. Honestly, a lot of people ignored what Captain Brown said to other people because a lot of times it was out of line.” Lt Col B testified that he had no recollection of appellant’s comments, although he acknowledged that the remarks might have been made.
In March 1996, according to Capt TT, appellant approached her in the medication room and told her about an unpleasant encounter he had just had with a patient, in which he was concerned that a female patient was “coming on” to him. He told Capt TT that the patient commented on how good he looked in his scrubs and asked if he was going to be the one who took her panties off. The patient made him uncomfortable, and he asked another nurse to take over.[12] He then asked Capt TT if she had ever experienced something similar. She, testified that she was “bothered” by this conversation because “he kept talking about it____ [H]e called his pants ‘drawers’ and stuff like that, and I just didn’t want to hear it, and so I walked away.”[13]
Prior to the March 1996 dispute between Capt TT and appellant over the procedure for counting medical instruments, Capt TT did not voice any objections or otherwise express concern about appellant’s remarks. With respect to physical contact, she conveyed her dislike of the touching in August 1995. Following the dispute about the medical instruments, she complained to Lt Col B. He referred the matter to higher authorities, which led to an investigation and the Article 133 charges against appellant. At trial, Capt TT testified that her interaction with appellant routinely made her feel uncomfortable, angry, or inferior. With respect to his comments, she testified: “The things that he said, I just — I didn’t want to make a scene. I didn’t say anything. I usually just walked him off.” She also testified: “I didn’t acknowledge to him it was okay. I think he knew I didn’t like it. [W]hen I would shrug my shoulder away and get up and walk away from him during a conversation, I think that was — I made my point.”
When asked why she had not reported the matter earlier, she said that although she was aware of Air Force policies on sexual harassment, including the pamphlet introduced into evidence at trial, she felt that she got along well with appellant and wanted to handle the matter herself. Capt TT, who is Caucasian, also testified that she was afraid of starting a racial issue and having appellant call her a racist, apparently because he frequently called their supervisor a racist.[14] She summed up her position by testifying:
I didn’t want to start a fuss. I was new there. I worked with all men. I didn’t want to be the new female coming in starting a fuss. I didn’t want my husband to know because I thought my husband might want to go confront him and do something that maybe he shouldn’t. I didn’t want [Lt Col B] to know because Captain Brown and [Lt Col B] were having a problem anyway that Captain Brown told me was racist [sic]. I didn’t want to start a racial issue. I thought I was the only person involved in all this. I didn’t want to say that he was touching me or accuse him of anything, thinking that I was the only person involved. I honestly thought he would say, “That’s just her word against *382 mine.” I thought I could take care of it myself by just letting him know and pushing him away and letting him know nonchalantly — I wanted to get along with him. We did get along well. We — we got along very well when we worked together as long as I kept my cool and ... [Pause.] There was times [sic] where we had some disputes, but it wasn’t over the touching. You know, over personal stuff. It was over something to do with business. [Pause.] I didn’t want to tell anyone honestly.
II. BACKGROUND: CONDUCT UNBECOMING AN OFFICER AND A GENTLEMAN
Article 133 prohibits “conduct unbecoming an officer and a gentleman.” In civilian life, this broadly-worded statute would be subject to challenge as unconstitutionally vague in a criminal law proceeding. See Parker v. Levy, 417 U.S. 733, 753-56, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). The Supreme Court has held, however, that Article 133 is constitutional as applied to members of the armed forces, so long as the accused has received “fair warning of the criminality” of his or her conduct. Id. at 756, 94 S.Ct. 2547. In this regard, the language in the Manual for Courts-Martial has “narrowed the very broad reach of the literal language of [Articles 133 and 134 (the General Article)] ..., and at the same time has supplied considerable specificity by way of examples of the conduct which they cover.” Id. at 753-54, 94 S.Ct. 2547. The Supreme Court also noted that “further content may be supplied ... by less formalized custom and usage.” Id. at 754, 94 S.Ct. 2547.
The Manual for Courts-Martial notes with respect to the offense of conduct unbecoming an officer and a gentleman:
There are certain moral attributes common to the ideal officer and the perfect gentleman. ... Not everyone is or can be expected to meet unrealistically high moral standards, but there is a limit of tolerance based on customs of the service and military necessity below which the personal standards of an officer, cadet, or midshipman cannot fall without seriously compromising the person’s standing as an officer, cadet, or midshipman or the person’s character as a gentleman. This article prohibits conduct by a commissioned officer, cadet, or midshipman which, taking all the circumstances into consideration, is thus compromising.
Para. 59c(2), Part IV, Manual for Courts-Martial, United States (2000 ed.).[15] The Manual reflects traditional military law. Winthrop, in his authoritative treatise, noted with respect to an earlier version of the statute:
Though it need not amount to a crime, it must offend so seriously against law, justice, morality or decorum as to expose to disgrace, socially or as a man, the offender, and at the same time must be of such a nature or committed under such circumstances as to bring dishonor or disrepute upon the military profession which he represents.
... [I]f the act, though ungentlemanlike, be of a trifling character, involving no material prejudice to individual rights, or of-fence against public morals or decorum, it will not in general properly be viewed as so affecting the reputation of the officer or the credit of the service as to be made the occasion of a prosecution under the Article.
William Winthrop, Military Law and Precedents 711-12 (2d ed. 1920 Reprint) (footnotes omitted). Article 133 is not violated by conduct that falls short of the attributes of an “ideal officer and the perfect gentleman” or by “slight deviations constituting indecorum or breaches of etiquette,” but by conduct that exceeds the “limit of tolerance” set “by the custom of the service to which the officer belongs.” James Snedeker, Military Justice Under the Uniform, Code 890 (1953); see generally Keithe E. Nelson, Conduct Expected of An Officer and a Gentleman: Ambiguity, 12 A.F. L.Rev. 124 (1970).
*383 III. DISCUSSION
A. CONSIDERATION OF AIR FORCE POLICY ON DISCRIMINATION AND SEXUAL HARASSMENT
Appellant argues that the military judge erred when he permitted the Government to introduce into evidence Air Force Pamphlet (AFP) 36-2705, Discrimination and Sexual Harassment (28 February 1995). We review this ruling for an abuse of discretion. United States v. McElhaney, 54 MJ 120, 129 (2000).
At the time of the events that are the subject of the present case, the Air Force did not have a punitive regulation proscribing sexual harassment. Conduct amounting to sexual harassment could be punished as a military offense if it constituted maltreatment of a subordinate under Article 93, UCMJ, 10 USC § 893; see para. 17c(2), Part IV, Manual, supra. The Government, however, chose not to prosecute the present case under Article 93, and has not argued at trial or on appeal that appellant violated regulatory or customary norms regarding superior-subordinate relationships.
Because the Government chose to prosecute the case under Article 133 as conduct unbecoming an officer and a gentleman, it sought to introduce into evidence the Air Force pamphlet setting forth policy on sexual harassment to show notice of the type of conduct that was prohibited and to establish a benchmark for conduct deemed unbecoming an officer and a gentleman in the Air Force community. As noted in the Government’s final brief in the present appeal, “(t]he pamphlet was relevant in establishing the standard of conduct expected of Air Force officers,” and introduction of the pamphlet was “necessary to establish that Appellant was aware that his behavior was impermissible.” Answer to Final Brief at 5, 24.
The pamphlet describes various examples of conduct that may raise concerns, but does not purport to identify any particular action as prohibited. Instead, it relies upon the following definition of sexual harassment to establish notice of the standard of conduct:
Sexual harassment. A form of sex discrimination that involves unwelcomed sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when:
• Submission to or rejection of such conduct is made either explicitly or implicitly a term or condition of a person’s job, pay or career, or
• Submission to or rejection of such conduct by a person is used as a basis for career or employment decisions affecting that person, or
• Such conduct has the purpose or effect of unreasonably interfering with an individual’s work performance or creates an intimidating, hostile, or offensive work environment.
AFP 36-2705 at 29. The pamphlet adds that the abuse “need not result in concrete psychological harm to the victim, but rather need only be so severe or pervasive that a reasonable person would perceive, and the victim does perceive, the work environment as hostile or abusive.” In addition, the pamphlet notes that with respect to military personnel, the term “ ‘[workplace’ is an expansive term ... and may include conduct on- or off-duty, 24 hours a day.” Id.
The pamphlet provides detailed guidance for dealing with improper conduct. The guidance emphasizes the preference for informal resolution at the lowest possible level, but does not preclude formal actions, including military justice proceedings. Id. at 6-15.[16] The pamphlet does not prohibit per *384 sonal or sexual relationships among officers, nor does it establish a general prohibition against comments of a personal or sexual nature among officers. Only “unwelcomed” comments which affect employment or create a hostile work environment are prohibited.
At trial, defense counsel argued that the pamphlet was not relevant under Mil.R.Evid. 401 and 402, Manual, supra, and that its probative value was outweighed by the danger of unfair prejudice under Mil.R.Evid. 403. Counsel asserted that the pamphlet could not be used in a criminal prosecution because it was not a punitive regulation and did not accurately define what legally constitutes sexual harassment. Counsel expressed additional concern, which is reflected in Granted Issue II, that the examples in the pamphlet might be viewed as conclusively establishing sexual harassment, and that any material used in that fashion would improperly influence the members to appellant’s detriment.
After considering detailed argument from both parties, the military judge admitted the pamphlet, finding it relevant to establish whether appellant’s conduct constituted a violation of Article 133. He addressed defense concerns about prejudice through an instruction to the members, in which he advised them that appellant was not charged with a dereliction of duty by failing to follow the pamphlet, and that if they should decide that appellant’s behavior contradicted the pamphlet’s guidance, “it does not automatically follow that his conduct was unbecoming an officer.”
We agree with the military judge that the pamphlet was relevant to establish notice of prohibited conduct and the applicable standard of conduct in the Air Force community. See United States v. Boyett, 42 MJ 150 (1995). Such notice was particularly important in the present case. As a general matter, personal interactions among military officers are not prohibited by law, regulation, policy, or custom. On the contrary, the unique conditions of military service — frequently involving long working hours, lengthy deployments for training and operations, harsh working and living conditions, and dangerous assignments — tend to break down the distinctions between personal and professional associations prevalent in civilian society. As noted in the pamphlet, for military personnel, the term “workplace” is an expansive term that may include “off-duty” conduct, 24 hours a day. AFP 36-2705 at 29.
As a general matter, military officers are not precluded from engaging in conversations with a fellow officer of the opposite sex involving the type of comments made in the present case with respect to physical appearance, social contacts, or sexual matters absent a pertinent custom or policy placed in evidence. This is not particularly remarkable, given the variety of comments that are likely to be made in conversations between officers of the opposite sex who may have relationships ranging from casual acquaintance through dating, courtship, and marriage.
Under these circumstances, the existence of pamphlets or other evidence of customs and standards limiting such communications are of particular importance in providing notice of the distinction between permissible banter and impermissible remarks. Cf. United States v. Rogers, 54 MJ 244, 256 (2000) (citing an Air Force Instruction as establishing a standard for dating relationships among officers by limiting the prohibition to relationships between senior and junior officers within the same command).
The focus on “unwelcomed” comments in the pamphlet was relevant in the present case because it provided notice of the standard for making the critical distinction between permissible and impermissible speech. Given the wide variety of personalities and relationships that may exist among officers, there is likely to be an equally wide variety of reactions to comments of a personal or sexual nature. The standard in the pamphlet emphasizes the need to focus on the personal interactions at issue to determine whether *385 the remarks were “unwelcomed.” In some cases, the comments may be so egregious that any reasonable officer would know that they would be unwelcome. In most cases, however, it is necessary to examine the nature of the interaction between the parties to the conversation to determine whether the person making the remarks had reasonable notice that the comments would be regarded as unwelcome, particularly when the comments are not overtly sexual or demeaning, for the standard also requires that the content of conduct be sexual.
Likewise, given the wide variety of personalities present in the service, co-workers may be offended from time to time by the behavior of their colleagues. But offensive conduct does not necessarily constitute criminal conduct. The pamphlet appropriately sets a higher standard, requiring that conduct be so severe or pervasive that it creates a hostile work environment. By structuring such an analysis, the pamphlet establishes a standard for distinguishing between permissible and impermissible speech. Therefore, the pamphlet was admissible because it fulfilled the requirement under Article 133 to establish a standard of conduct and notice of the standard.
We recognize that there is a countervailing consideration — the danger that introduction into evidence of examples of proscribed conduct could be used to impermissibly introduce command policy into the deliberation room, leading the members to reach a conclusion based upon the published examples rather than their application of the relevant standard to the facts of the case. See, e.g., United States v. Grady, 15 MJ 275 (CMA 1983). When it is necessary to introduce the custom of the service to prove an element of an offense, however, it is likely that the probative value will outweigh the prejudicial effect. Mil.R.Evid. 403. In some cases, it may be necessary to redact examples or to provide tailored instructions explaining the difference between examples and standards of conduct, and further explaining the manner in which the standards of conduct apply to the elements of proof. The defense did not request either step in the present case, and we do not find that the possibility of confusion was so great that the military judge was required to redact material or give tailored instructions on his own motion. Accordingly, we hold that the military judge did not abuse his discretion by admitting the pamphlet.
B. LEGAL SUFFICIENCY OF THE EVIDENCE
In considering whether the evidence in this case is legally sufficient to sustain appellant’s conviction for conduct unbecoming an officer and a gentleman, we must “view[] the evidence in the light most favorable to the prosecution” and determine whether “any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
In the present case, it was necessary for the Government to prove beyond a reasonable doubt that appellant committed the charged acts and that under the circumstances, the acts constituted conduct unbecoming an officer and a gentleman. As noted in section III. A., supra, the Government relied upon AFP 36-2705 to establish the applicable standard of conduct. Under the circumstances of the present case, the Government endeavored to show that appellant’s conduct fell within the pamphlet’s proscriptions; that is: (1) appellant’s conduct was “unwelcomed”; (2) it consisted of verbal and physical conduct of a sexual nature; and (3) it created an intimidating, hostile, or offensive work environment that was so severe or pervasive that a reasonable person would perceive the work environment as hostile or abusive, and the victim of the abuse perceived it as such.[17] We shall first consider the verbal remarks and then consider the physical activity.
*386 1. The Allegations Involving Appellant’s Remarks
The Government charged appellant with “persistently directfing] comments and questions of a personal or sexual nature” to three of his fellow nurses. He was not charged with maltreatment under Article 93, or abuse of a superior-subordinate relationship under Article 133. In that regard, we note that the Government preferred a charge of maltreatment under Article 93 against appellant but did not refer it to court-martial. According to the prosecution, this decision was made because “none of the three victims named in the ... specifications were ... subject to the orders of the accused in this case.”
The prosecution emphasized that the heart of each specification was the allegation that appellant, a married man, acted “persistently” in communicating personal or sexual matters to the other nurses. The term “persistent” in this context refers to “continuing in a course of action without regard to opposition or previous failure,” Webster’s Third New International Dictionary 1686 (1981), which echoes the policy set forth in the pamphlet. As noted in Part III. A., supra, the pamphlet does not establish a general prohibition against remarks of a personal or sexual nature. Only “unwelcomed” remarks so severe or pervasive that they create a hostile or abusive environment are proscribed. The limitation of the proscription to “unwel-comed” comments is a critical component of the policy, because it separates speech that will be tolerated from speech that is prohibited.
Under the policy in the pamphlet, impermissible speech could be shown by demonstrating that: (1) appellant’s remarks were “unweleomed” and (2) the comments were “so severe or pervasive” that a reasonable person would perceive that the remarks created a “hostile or abusive” environment, and the victim perceived them as such.
The record is clear that none of the nurses with whom appellant conversed advised him that his remarks were not welcome. On the contrary, the record reflects that his remarks usually produced a straightforward response or a response in kind, but he was never told that the remarks were unwelcomed. It is noteworthy that Capt TT, who firmly voiced her objections to his physical contact with her, did not mention any concerns to him about the tenor of his remarks, either at that time or thereafter. Likewise, none of his other colleagues or supervisors advised him that he was engaging in inappropriate behavior — even though many of the conversations were observed by others.
The record reflects a working atmosphere in and around the operating room and lounge which accepted discussions involving physical appearance and sexual matters. For example, appellant’s question to Capt TT about extramarital affairs did not occur in isolation, but in the context of an ongoing discussion among the personnel in the lounge about extramarital affairs in Hollywood. Similarly, his question to Capt TT about masturbation occurred during a discussion among personnel of sexually explicit materials produced by a popular entertainer, including the topic of masturbation. Capt TT testified that conversations involving sexual topics were commonplace at that time in the operating room, and she acknowledged that she had been known to make an off-color joke.
An even more telling example involves appellant’s reference to Capt TT in a two-piece swimsuit. Again, these remarks were not made in isolation, but occurred in the presence of the supervisor, Lt Col B. Appellant made the swimsuit comment in the course of interrupting Capt TT’s conversation with Lt Col B. According to Capt TT, Lt Col B not only failed to express any concern about the interruption, he said nothing to indicate that he regarded appellant’s remarks as inappropriate, indicating the degree to which comments about physical appearance were tolerated.[18]
Although the standard in the pamphlet does not require a recipient of sexual re *387 marks to tell the speaker that the remarks were unwelcome, the recipient’s action or inaction in response to the remarks is relevant to determining whether the speech was unwelcome and whether it was “so severe or pervasive that a reasonable person would perceive, and the victim does perceive, the work environment as hostile or abusive.” The record of the responses of the recipients in the present ease does not support a finding that appellant’s remarks violated this standard.
We note that disparity in rank or supervisory relationships may be relevant to a determination as to whether the standards in the pamphlet have been violated. The mere existence of such factors, however, does not establish that speech was unwelcome or that it created a “hostile or abusive” work environment. Although appellant served in a supervisory position with regard to lLt VC and was superior in rank to Capt TT for most of the period encompassing the charged offenses, he was not charged with an abuse of rank offense. In fact, the prosecution dropped the only charge dealing with an abuse of rank. Moreover, the prosecution’s case did not rely on disparity in rank to prove that appellant’s comments violated Air Force standards.
Finally, we note that the record does not support a finding that appellant’s comments created “an intimidating, hostile, or offensive work environment.” The pamphlet defines what type of conduct creates a hostile work environment:
The above definition emphasizes that workplace conduct, to be actionable as “abusive environment harassment,[”] need not result in concrete psychological harm to the victim, but rather need only be so severe or pervasive that a reasonable person would perceive, and the victim does perceive, the work environment as hostile or abusive.
AFP 36-2705 at 29.
The subjective component of the standard requires evidence that the recipient perceived his or her work environment as hostile or abusive as a result of severe or pervasive conduct. The testimony of the three nurses falls short of the standard. lLt VC testified that appellant’s behavior was inappropriate, but did not amount to sexual harassment. Capt LK testified that some of appellant’s comments were inappropriate and made her uncomfortable, others did not offend her, and that she felt she could handle the situation herself. Capt TT testified that she had a good working relationship with appellant. In light of the fact that the recipients of the charged comments testified that the verbal conduct was merely inappropriate or unprofessional and that the situation was manageable, the evidence is legally insufficient to demonstrate that the victims perceived the work environment as hostile or abusive according to the standard relied upon by the Government in the Air Force pamphlet.
The rigorous standard in the pamphlet shows that it is not merely a civility code for policing the workplace. Only severe conduct with harsh effects constitutes sexual harassment under the pamphlet; comments or questions that offend one’s sensibilities and make one uncomfortable do not create a hostile work environment under the standard in the pamphlet. Appellant’s breaches of etiquette may well have warranted “instruction, counseling or other types of administrative corrective action,” United States v. Wolfson, 36 CMR 722, 731 (ABR 1966), but his comments did not violate the standard relied upon by the Government at trial to establish the custom of the Air Force for purposes of Article 133. Accordingly, the findings of guilty with respect to specification 7 of Charge II and specification 1 of the Additional Charge will be set aside, and those specifications will be dismissed. Specification 1 of Charge II will be modified as described in Section IV, infra.
2. The Allegations Involving Physical Contact
We reach a different conclusion with respect to the incidents involving physical *388 contact. There is greater latitude of permissible action with respect to speech than physical contact because of the manner in which the interplay of words may be used to establish the parameters of a relationship. In the circumstances of the relationship between appellant and his fellow nurses, it was not reasonable for him to assume that they would consent to physical contact of an intimate nature absent some communication of receptivity or consent.
In the present case, it is noteworthy that although the members convicted appellant of four instances of physical contact, they acquitted him of three other instances. We take into consideration the fact that the members, who heard the testimony and observed the demeanor of the witnesses, viewed the evidence as distinguishing between permissible and impermissible contact. The convictions involved intimate contact with members of the opposite sex that was not incidental, collegial, or innocuous and did not take place where there was any verbal or nonverbal indication of consent. Accordingly, we will affirm appellant’s convictions under Article 133 as set forth in specifications 3 and 6 of Charge II, specification 3 of the Additional Charge, and the portion of specification 1 of Charge II concerning physical contact. Because we have dismissed or modified the only charges affected by Granted Issue I, it is not necessary to address Issue I in this opinion.
IV. CONCLUSION
The decision of the United States Air Force Court of Criminal Appeals is affirmed in part and reversed in part, as follows: the findings of guilty are affirmed with -respect to specification 3 of Charge I, specifications 3 and 6 of Charge II, specification 3 of the Additional Charge, and specification 1 of Charge II, as modified.[19] The findings of guilty with respect to specification 7 of Charge II and specification 1 of the Additional Charge are set aside, and those specifications are dismissed. The sentence is set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing as to sentence may be ordered.

. Lt Col B testified that appellant had been upset with him several months earlier and threatened to go to the Inspector General because Lt Col B had delayed his entry into Squadron Officer School. Appellant was first on the list in terms of seniority, but Lt Col B asked the command to place appellant last for staffing reasons. Appellant entered the next available class.

. Appellant was convicted of violating Article 133 by ‘‘persistently directing] comments and questions of a personal or sexual nature” to lLt VC, including: "You have pretty hair,” "You have pretty eyes,” “How much do you weigh?,” "What size are you?,” "What is your phone number?,” "Do you have a boyfriend?,” “Does your boyfriend live in Montgomery?,” and "What type of men do you like?”

. This physical contact resulted in appellant's conviction under Article 133.

. Appellant was acquitted of the specification of disrespect to a superior officer that encompassed these comments. Appellant was also acquitted of the specification of conduct unbecoming an officer and a gentleman that entailed "inappropriate” comments he made to lLt VC after she began working in the operating room.

. Appellant was convicted of violating Article 133 by “persistently directing] comments and questions of a personal or sexual nature” to Capt LK, including: "I’m coming over tonight,” “What kind of man are you attracted to?,” "Are you dating anyone?,” "You look fit,” "Would you like to go sight-seeing?,” and “You don’t need to work out because you look fine.” He was also convicted of violating Article 133 as a result of touching Capt LK’s knee, and was acquitted of violating Article 133 with respect to touching Capt LK's face.

. Appellant was convicted of violating Article 133 as a result of this conduct.

. Capt TT testified that "nibby” was an "Indiana term” for nosey.

. Appellant was acquitted of the charge resulting from this contact.

. According to Capt TT, this conversation took place in the presence of another male nurse. The other nurse, however, testified that he did not recall this conversation.

. Appellant was convicted of violating Article 133 as a result of this contact.

. The members acquitted appellant of the specification concerning this incident.

. Lt Col B testified that appellant had also informed him of the encounter with a patient.

. As a result of this conversation and the various conversations between appellant and Capt TT over the 10-month period, he was convicted of violating Article 133 by "persistently directing] comments and questions of a personal or sexual nature” to Capt TT, including: "Have you ever had an affair?,” "You look like a size 4,” "You have a very good shape and look very good for your age,” “Do you wear a one piece or two piece swim suit?,” “I bet you wear a two piece [swim suit],” "A patient told me I look good in my pants.” "Are you happily married?,” "Do you get along with your husband?,” "Would you like to go out for lunch?,” and "Do women masturbate?”

. Capt TT testified that she and appellant discussed racism frequently. Appellant was acquitted of the specification of disrespect to a superior that encompassed comments he made to Capt TT about Lt Col B being a racist.

. All Manual provisions are identical to the ones in effect at the time of appellant’s court-martial.

. Other Air Force regulations note that the military Equal Opportunity and Treatment Program has primary responsibility for sexual harassment complaints and that attempts at informal resolution are encouraged before initiating the formal complaint process. See para. 4.9, AFI 36-2706, Military Equal Opportunity and Treatment Program (1 December 1996)(the purpose of the complaint process is to “[e]ncourage early reporting of problems at the lowest level and promote fair resolution”); para. 3.37, AFI 90-301, Inspector General Complaints (12 August 1999) (Military Equal Opportunity has primary responsibility for sexual harassment complaints and all such complaints filed through IG channels will be immediately referred to MEO); para. 1.10, AFI 71-101, Criminal Investigations (1 December 1999)(un-Iess it involves a specific criminal offense, like *384 rape, or a person in the grade of Colonel or above, AFOSI does not investigate complaints of sexual harassment).

. The prosecution did not contend that appellant’s conduct violated those portions of the policy involving unwelcomed sexual advances that are made a condition of employment or that affect career or employment decisions.

. While this arguably could show a failure of leadership on the part of Lt Col B, we note that Lt Col B testified that he did not recall the swimsuit remark incident, but stated that if he did not think a comment was improper he would not approach the individual about it. We reach no conclusion as to whether the incident occurred and, if so, how he responded. We accept *387 Capt TT’s testimony solely for the purposes of considering the legal sufficiency of the evidence under Jackson, supra.

. Specification 1 of Charge II is modified to read as follows: "Did, at or near Maxwell Air Force Base, Alabama, on divers occasions from on or about 1 February 1995 to on or about 3 February 1995, wrongfully and dishonorably touch the hair and knee of [lLt VC], a woman • not his wife, without the consent of the said [lLt VC], that, under the circumstances, these acts constituted conduct unbecoming an officer and a gentleman.”