# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**R.Q. WARD, D.C. KING, G.G. GERDING**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

v.

**TIMOTHY BALDWIN**
**MASTER SERGEANT (E-8), U.S. MARINE CORPS**

**NMCCA 201400014**
**SPECIAL COURT-MARTIAL**

**Sentence Adjudged**: 29 August 2013.
**Military Judge**: LtCol Leon Francis, USMC.
**Convening Authority**: Commanding Officer, Headquarters Battalion, 1st Marine Division, Camp Pendleton, CA.
**Staff Judge Advocate's Recommendation**: LtCol D.R. Kazmier, USMC.
**For Appellant**: LT Carrie Theis, JAGC, USN.
**For Appellee**: Maj Paul Ervasti, USMC.

**13 November 2014**

---------------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

GERDING, Judge:

A military judge, sitting as a special court-martial, convicted the appellant, contrary to his pleas, of one specification of violating a lawful general order by committing sexual harassment and one specification of violating a lawful regulation by fraternizing in violation of Article 92, Uniform Code of Military Justice, 10 U.S.C. § 892. The military judge

sentenced the appellant to confinement for 89 days, reduction to pay grade E-7, and a bad-conduct discharge.  The convening authority approved the sentence as adjudged.

The appellant raises four assignments of error:  (1) a bad-conduct discharge is inappropriately severe; (2) the military judge improperly admitted evidence under MILITARY RULE OF EVIDENCE 404(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.); (3) the evidence as to both charges is legally and factually insufficient; and (4) plain error occurred when the military judge admitted evidence of the appellant's nonjudicial punishment (NJP) from a prior enlistment.

For the reasons below, we conclude the findings and sentence are correct in law and fact and no error materially prejudicial to the substantial rights of the appellant occurred. Arts. 59(a) and 66(c), UCMJ.

## Legal and Factual Sufficiency

We review the legal and factual sufficiency of a conviction *de novo*.  *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).  The test for legal sufficiency is, viewing the evidence in the light most favorable to the prosecution, whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Brown*, 55 M.J. 375, 385 (C.A.A.F. 2001) (quoting *Jackson v. Virginia*, 443 U.S  307, 319 (1979)).  For factual sufficiency, we must ourselves be convinced of the appellant's guilt beyond a reasonable doubt, taking into account that the trial court saw and heard the witnesses.  Art. 66(c), UCMJ; *Washington*, 57 M.J. at 399.

Both specifications here allege a violation of Article 92, UCMJ.  To prove a violation of Article 92, the Government must prove beyond a reasonable doubt that (1) a certain lawful general order or regulation was in effect; (2) the accused had a duty to obey that order or regulation; and (3) the accused violated or failed to obey the order or regulation.  Here, Charge I alleged that the appellant violated a lawful general regulation, Article 1165, U.S. Navy Regulations (1990), by wrongfully having an unduly familiar relationship with Corporal (Cpl) CS.  Additional Charge I alleged that the appellant violated Paragraph 4(a)(1)(a), Marine Corps Order (MCO) 1000.9A (30 May 2006), by sexually harassing Lance Corporal (LCpl) CD. The appellant does not challenge the existence of the order or regulation, or that he had a duty to obey them.  Thus, the only

2

question is whether the evidence that the appellant violated the regulation and order is legally and factually sufficient.

Fraternization

Article 1165, U.S. Navy Regulations, prohibits "personal relationships" between enlisted members that are "unduly familiar and that do not respect differences in grade or rank." An essential element of an alleged violation of Article 1165 is the existence of a relationship. *United States v. Jackson*, 61 M.J. 731, 735 (N.M.Ct.Crim.App. 2005). Relationships are prohibited when prejudicial to good order and discipline or of a nature to bring discredit on the naval service. *Id*. Examples of prohibited relationships are those that call into question a senior's objectivity; result in actual or apparent preferential treatment; undermine the authority of a senior; or compromise the chain of command. Art. 1165, U.S. Navy Regulations.

During 2012, the appellant met then-LCpl CS, who was assigned to Truck Company A. In August 2012, the appellant investigated several Marines involved in using Spice. One of the persons under investigation was a friend of LCpl CS. LCpl CS testified that prior to her friend getting into trouble, she did not have much contact with the appellant. During the Spice investigation, the appellant exchanged personal phone numbers with LCpl CS and began communicating with her to gather information relevant to his investigation. Also in August 2012 a Marine committed suicide in the barracks and the appellant bore some responsibility for investigating the suicide. The suicide had a significant impact on Marines in the barracks, including LCpl CS.

In August and into early September, the appellant communicated with LCpl CS about the Spice investigation, the barracks suicide, as well as problems LCpl CS was experiencing with the barracks manager and with qualifying at the rifle range. During this time, LCpl CS also sought and received advice from the appellant on professional and personal matters. LCpl CS testified that the appellant communicated with her about professional matters, and that he counseled her on personal matters, as a mentor. These counseling or mentoring sessions with the appellant mostly occurred one-on-one in the appellant's office, often times after normal work hours, and on occasion with the office door closed.

In addition to his one-on-one counseling sessions, the appellant often would embrace LCpl CS in what she described at

3

trial as a "full hug," which made her uncomfortable. During one counseling session in the appellant's office, he asked LCpl CS to sit on his lap, but she declined. On one occasion in the barracks, the appellant made a sexual comment in front of LCpl CS and another female Marine, LCpl KV, and hugged them both. On another occasion, the appellant made a sexual comment to LCpl CS about her pregnancy. She testified that the appellant's various comments and hugs made her feel uncomfortable and that she thought the appellant was "perverted."

Although we recognize that there might have been communications between the appellant and LCpl CS that were official in nature, the number of those communications and the times many of them occurred demonstrate that the appellant's relationship with LCpl CS became unduly familiar, without respect for the difference in their rank. LCpl CS testified that the appellant asked her about personal matters in some of the texts and calls, also showing that their relationship devolved into more than just the appellant seeking work-related information.

We also find sufficient evidence that their unduly familiar relationship was prejudicial to good order and discipline. LCpl CS testified the appellant was in her chain-of-command. She said that he hugged her on occasion and the hugs progressed to a "full blown embrace." The appellant's hugs made her feel awkward. During one encounter with the appellant, another member of their unit, LCpl KV, was present and witnessed the appellant's inappropriate interactions with LCpl CS. During that encounter, the appellant hugged LCpl CS and made inappropriate jokes with her. LCpl CS testified that she and LCpl KV felt the appellant was perverted and made them feel uncomfortable. On another occasion, the appellant invited LCpl CS to sit on his lap, again making her feel uncomfortable. Even though LCpl CS had some negative interactions with the appellant, she continued to seek him out in an apparent attempt to use their unduly familiar relationship to her advantage. LCpl CS sought the appellant's help with matters related to her barracks assignment and her performance at the rifle range.

The appellant's unduly familiar relationship with LCpl CS affected her in the workplace. She testified that after the appellant asked her to sit on his lap, she began to avoid him and did not want anything else to do with him. That LCpl CS used the relationship with the appellant to her advantage, that she then wanted to avoid him and have nothing to do with him, and that at least one member of their unit witnessed the

4

inappropriate behavior demonstrates the prejudice to good order and discipline that Article 1165 seeks to prevent.

Therefore we believe the evidence is legally sufficient that the appellant fraternized with LCpl CS, in violation of Article 1165. We are likewise convinced of the appellant's guilt beyond a reasonable doubt and hold the evidence is factually sufficient.

Sexual Harassment

MCO 1000.9A prohibits "sexual harassment." To constitute sexual harassment, a person's behavior must (1) be unwelcome, (2) be sexual in nature, and (3) occur in *or* impact the work environment. MCO 1000.9A, enclosure (1), ¶ 2. The appellant argues that individually his comments and physical contact with LCpl CD were not sexual in nature and did not impact the work environment. However, the appellant's comments and actions cannot be parsed out for analysis. "If the behavior occurs in the work environment and is unreasonable, it may be considered sexual harassment, even if displayed only once. Other less obvious behaviors can become sexual harassment if they are repeated." MCO 1000.9A, enclosure (1), ¶ 2c(4). Finally, "[c]omments need not be expressly or explicitly sexual to be of a sexual nature." *United States v. Pope*, 63 M.J. 68, 72 (C.A.A.F. 2006).

In 2012, the appellant served as the acting First Sergeant of Truck Company A. As part of his duties, he met LCpl CD, a clerk in S-1. LCpl CD's relationship with the appellant started out as professional but became friendlier over time. LCpl CD testified that she started confiding in the appellant about personal issues and that she looked up to him as a mentor. LCpl CD testified that the appellant engaged in physical contact— hugs--with her over the course of several months and that this culminated with several incidents one day in July 2012. In July 2012, the appellant saw LCpl CD walking on base. He stopped his truck and asked if she wanted to have lunch. LCpl CD agreed and they went to pick up food at McDonald's. The appellant and LCpl CD talked about LCpl CD's pregnancy. The appellant told her that some husbands get their wives pregnant right before deployment so they do not have to be there during the pregnancy. LCpl CD testified this comment made her feel bad. The appellant then said that some pregnant women have sex with other men during their pregnancy. LCpl CD thought the comments were "weird." They picked up food at the McDonald's drive-through and the appellant started driving off-base. LCpl CD did not

know where they were going and worried that she would be late returning to her unit after lunch.

The appellant took LCpl CD to his home off-base. He showed her a guest area adjacent to the garage and offered that LCpl CD could "crash" there anytime. The appellant invited LCpl CD into his home but she declined. They sat in the back yard together and ate lunch. They talked about the death of LCpl CD's father and the deployment of LCpl CD's husband. Eventually the appellant drove LCpl CD back to base. On the way, he commented that he did not want her to think he was flirting but that her eyes looked seductive. When he dropped off LCpl CD at work, he took her hand as if to shake it, but instead held it an unusually long time and "caressed" it. LCpl CD testified that the appellant rubbed her hand in a circular motion. She said that she did not invite the comments or physical contact.

LCpl CD testified that after that day, her interaction with the appellant was never the same. She did not confide in him anymore or seek out his advice. When she did see him, she felt awkward. She felt disgusted with herself and the appellant. We believe that when considered together, the appellant's comments and touching of LCpl CD were sexual in nature.

We also reject the appellant's argument that his behavior did not have an impact on the work environment. LCpl CD testified that she stopped seeking advice from the appellant and that when she saw him at work, she felt disgusted and dirty. These behaviors occurred not between two Marines of equal rank in different units, but between a junior lance corporal and a senior master sergeant, who was the acting First Sergeant, in the chain-of-command. Additionally, the appellant ignores that the instruction prohibits such behavior if it impacts the work environment *or* occurs in the work place. Even though some of the appellant's conduct occurred in his truck and at his off-base home, it occurred during the work day, and he and LCpl CD were in uniform. Those facts satisfy us that the appellant's behaviors occurred in and impacted the work place. *See* MCO 1000.9A, enclosure (1), ¶ 2(c)(3) (indicating that "'workplace' is an expansive term for military members and may include conduct on or off duty 24 hours a day").

Taking the appellant's actions with LCpl CD altogether and viewing the evidence in the light most favorable to the prosecution, we believe the evidence is legally sufficient that the appellant sexually harassed LCpl CD, in violation of MCO 1000.9A. We are likewise convinced of the appellant's guilt

6

beyond a reasonable doubt and hold the evidence is factually sufficient.

## MIL. R. EVID. 404(b) Evidence

The Government proffered the testimony of several witnesses who accused the appellant of touching them or making various comments that made them feel uncomfortable or that they believed were unprofessional. The military judge ruled that the testimony of five of those witnesses was inadmissible under MIL. R. EVID. 404(b). Appellate Exhibit XVIII. He ruled that the testimony of five other witnesses, LCpl CS, LCpl CD, LCpl KV, Cpl CM, and Sgt RW, was admissible under MIL. R. EVID. 404(b). *Id.*

Specifically, the military judge ruled that LCpl CS's and LCpl CD's testimony was admissible to show a common scheme or plan involving each other's allegations. He ruled that LCpl KV could testify about interactions with the appellant beyond those related to Additional Charge II, a charge in which LCpl KV was herself an alleged victim.[1] He ruled that LCpl KV's testimony, as well as Cpl CM's and Sgt RW's testimony was admissible under MIL. R. EVID. 404(b) to show a common scheme or plan for the charges involving both LCpl CS and LCpl CD. AE XVIII.

The appellant contends that the military judge erred in his ruling that LCpl CS's and LCpl CD's testimony was admissible to show a common scheme or plan involving each other's allegations in that their allegations were not "almost identical." The appellant also argues that the testimony of Sgt RW and Cpl CM was not sufficiently similar to LCpl CD's and LCpl CS's allegations and should not have been admitted to show a common scheme or plan. The appellant contends that evidence of the appellant's behavior and interactions with other women was inadmissible under Rule 404(b). We disagree.

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Barnett*, 63 M.J. 388, 394 (C.A.A.F. 2006). In determining whether the military judge abused his discretion, we are guided by the three-part test set out in *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989). For evidence to be admissible under MIL. R. EVID. 404(b), we must determine whether 1) the evidence reasonably supports a

---

[1] The military judge granted the appellant's motion to dismiss a charge of indecent language which was based on one of the appellant's comments to LCpl KV because the comment, although inappropriate, was not indecent.

7

finding by the court that the appellant committed certain prior crimes, wrongs or acts; 2) a fact of consequence is made more or less probable by the existence of the evidence; and 3) the probative value is not substantially outweighed by the danger of unfair prejudice.  *Id.*

As to the first part of the *Reynolds* test, the testimony of Sgt RW, Cpl CM, LCpl CS, LCpl CD, and LCpl KV reasonably supports a finding that the appellant engaged in the inappropriate behavior with them that each alleged.  Each testified that the appellant touched them and acted towards them in ways that were inappropriate, unprofessional, and made them feel uncomfortable.

Second, in order to prove the appellant engaged in fraternization, the Government had to prove that he had a "personal relationship" with LCpl CS.  To prove the appellant sexually harassed LCpl CD, the Government had to prove that the appellant engaged in behavior that was sexual in nature.  Part of the Government's proof of that personal relationship and sexual behavior involved the appellant's actions around LCpl CS and LCpl CD, including hugs, comments, and communications outside of those that could be expected of a purely professional relationship.  The testimony of these witnesses demonstrated that the appellant engaged in inappropriate sexual behavior and unprofessional relationships with subordinate female Marines.  Their allegations against the appellant are strikingly similar, and show that he planned to engage in an inappropriate relationship with LCpl CS and that he planned to harass LCpl CD. It is also easy to see in the appellant's actions with all five women a common scheme, which was to gradually groom his victim either over the course of a single encounter or several months to engage in more inappropriate behavior.

Finally, we believe the probative value of their testimony was not substantially outweighed by the danger of unfair prejudice.  The probative value of the testimony as to the appellant's plan and common scheme was high, while the risk of prejudice was low.  The appellant was tried by military judge alone and we are confident that the military judge properly weighed and evaluated each witness's testimony.  We also do not believe that the evidence against the appellant regarding the fraternization charge and the sexual harassment charge improperly spilled over into the military judge's determination of guilt on the other charge.  The evidence of each offense was strong and stood independently.

8

Even if the military judge erred in allowing the challenged testimony, we are convinced that the appellant suffered no material prejudice to his substantial rights.  The evidence against the appellant supporting the convictions for sexual harassment and fraternization was strong even without consideration of the appellant's interactions with other victims.

## Evidence of the Appellant's NJP

During sentencing, the Government offered Prosecution Exhibit 6, which included fitness reports documenting an NJP of the appellant's from a prior enlistment.  The military judge asked if the appellant objected to the exhibit and civilian defense counsel responded "no objection."  Record at 621.  During the defense sentencing case, the appellant submitted, and the trial court admitted, Defense Exhibit D, which also contained the appellant's fitness reports.  The fitness reports in Defense Exhibit D are identical to the ones in Prosecution Exhibit 6 that the appellant complains of now.

The appellant did not object to the military judge's consideration of evidence of his NJP from a prior enlistment.  Because he failed to object at trial to that evidence, the appellant now asserts plain error.  However, we decline to review for plain error because the appellant waived his right to review of this issue on appeal.  "'[W]aiver is a deliberate decision not to present a ground for relief that might be available in the law.'"  *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009) (quoting *United States v. Cook*, 406 F.3d 485, 487 (7th Cir. 2005)).  By affirmatively stating he had no objection, and by submitting his own evidence of his prior NJP, we find that the appellant waived any right to assert on appeal that the military judge erred in admitting this evidence.

## Sentence Appropriateness

The appellant contends that a bad-conduct discharge is inappropriately severe.  We disagree.  In accordance with Article 66(c), UCMJ, a military appellate court "may affirm only such findings of guilty and the sentence or such part or amount of the sentence as it finds correct in law and fact and determines, on the basis of the entire record, should be approved."  Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves. *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).  This requires "'individualized

9

consideration' of the particular accused 'on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180-81 (C.M.A. 1959)).  We independently determine the appropriateness of the sentence in each case we affirm.  *See United States v. Baier*, 60 M.J. 382, 384-85 (C.A.A.F. 2005).

The appellant accurately notes his respectable military career and service.  However, he is a senior enlisted Marine who sexually harassed a junior Marine in his chain-of-command.  He also engaged in an inappropriate relationship with a junior Marine in his chain-of-command.  Neither was an isolated incident, as shown by the appellant's prior misconduct that resulted in his NJP.  A repeat offender, the appellant engaged in the type of misconduct that is particularly pernicious to good order and discipline.  We are convinced on these facts that this appellant received an appropriate sentence.

## Conclusion

The findings and sentence are affirmed.

Senior Judge WARD and Judge KING concur.

For the Court


R.H. TROIDL
Clerk of Court

10