# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40318**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Angelo L. CEPEDA**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary[1]

Decided 21 July 2025

———————————

*Military Judge*: Mark F. Rosenow.

*Sentence*: Sentence adjudged on 8 April 2022 by GCM convened at Minot Air Force Base, North Dakota. Sentence entered by military judge on 26 May 2022: confinement for 60 days, reduction to E-4, and a reprimand.

*For Appellant*: Captain Michael J. Bruzik, USAF; Tami L. Mitchell, Esquire.

*For Appellee*: Colonel Steven R. Kaufman, USAF; Colonel Matthew D. Talcott, USAF; Major Vanessa Bairos, USAF; Major Regina M. B. Henenlotter, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, GRUEN, and WARREN, *Appellate Military Judges*.

Judge WARREN delivered the opinion of the court, in which Chief Judge JOHNSON joined. Judge GRUEN filed a dissenting opinion.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

[1] Appellant appeals his conviction under Article 66(b)(1)(A), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(b)(1)(A), *Manual for Courts-Martial, United States* (2024 ed.) (2024 *MCM*).

_____

WARREN, Judge:

A general court-martial consisting of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of willful dereliction of duty on divers occasions (sexual harassment of a subordinate) in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892.[2,3] The military judge sentenced Appellant to confinement for 60 days, reduction to the grade of E-4, and a reprimand. The convening authority denied Appellant's request to disapprove the findings of guilty and took no action on the sentence.

Appellant raises five issues on appeal which we have rephrased: (1) whether Appellant's conviction for dereliction of duty on divers occasion is legally and factually sufficient, (2) whether the military judge erred by admitting as evidence Prosecution Exhibit 13 (excerpts of an expired version of Air Force Instruction (AFI) 36-2706), (3) whether Appellant was denied speedy post-trial processing due to the excessive delay in the Government's production of the record of trial, (4) whether the verbatim transcript is legally sufficient given it was not certified by either the military judge or the court reporter, and (5) whether Appellant's conviction should be dismissed for violating his right to speedy appellate review attributable to the delay between sentencing at trial and docketing Appellant's case on appeal.[4] In light of the fact that more than 18 months have elapsed from the time Appellant's case was docketed with this court until the issuance of this opinion, we have identified and will address a sixth issue: (6) whether Appellant is entitled to relief for unreasonable appellate delay between docketing and decision.

We have carefully considered issue (4) and find no discussion or relief is warranted. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)). Finding no error that

---

[2] Unless otherwise noted, all references to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*). All other references to the UCMJ and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*).

[3] In the same trial, members acquitted Appellant, consistent with his pleas, of one specification of willful dereliction of duty on divers occasions; one specification of abusive sexual contact; two specifications of sexual assault; one specification of assault consummated by a battery; and one specification of stalking, in violation of Articles 92, 120, 128, and 130, UCMJ, 10 U.S.C. §§ 892, 920, 928, and 930.

[4] Appellant personally raises issues (4) and (5) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

materially prejudiced a substantial right of Appellant in any of the remaining assignments of error, we affirm the findings and sentence.

## I. BACKGROUND

The primary evidentiary issue in this case centers upon whether the Government offered sufficient proof of a non-controversial fact: namely, that every Airman in the Air Force has a duty to abstain from sexual harassment of fellow Airmen in the workplace. While that duty is readily ascertainable as a matter of statute and service regulation, the issue here concerns whether the Government proved the existence of a duty to refrain from engaging in sexual harassment when they chose to rely upon proof of a military custom as the source of that duty.

The charges in this case stem from Appellant's conduct with two female Airmen. All parties were members in the same maintenance squadron at Minot Air Force Base (AFB), North Dakota. Appellant's sole conviction pertains to the conduct towards one of those Airmen, JJ, and this opinion will focus on the sexual harassment towards her. Specifically, JJ, a junior enlisted Airman during the relevant timeframe, alleged that Appellant, a technical sergeant (TSgt) and Expediter,[5] engaged in sexual harassment against her by creating a hostile work environment predicated on pervasive sexualized comments concerning her.

Appellant made sexual comments towards JJ approximately once a week between August and December 2018 in their workplace during the duty day. Those comments included Appellant commenting on JJ's body and appearance in a sexualized manner, with words to the effect that, *inter alia*, JJ's "a[**] looks good" and that her breasts "looked good in uniform." In addition, Appellant repeatedly asked JJ about her sex life with her boyfriend and fellow junior Airman, GS. Appellant coupled these illicit inquiries with boasts that he could "f[**]k [her] better than [her] boyfriend." JJ did not speak to Appellant about these comments because she felt it was not her "place" due to his position as her noncommissioned officer (NCO). JJ feared speaking out would "be considered disrespecting an NCO." Nonetheless, Appellant's repeated comments were unwanted and made JJ feel "very uncomfortable" and "disrespected. . . because nobody wants to hear that." With respect to her knowledge of how sexual harassment is regarded in the military, JJ stated, "[T]hey integrate in our minds that sexual assault and sexual harassment is a zero-tolerance thing."

---

[5] Witnesses testified that an "Expediter" is effectively the noncommissioned officer in charge (NCOIC) of the junior Airmen while on shift in the weapons maintenance shop.

Appellant's verbal advances were then punctuated by a physical sexual advance whereby he put his hand on her thigh and tried to kiss her while they were in a three-person vehicle on the flight line in the September/October 2018 timeframe. JJ testified she told Appellant she was uncomfortable, said "no," and leaned away to prevent Appellant's lips from touching her face. Appellant then apologized, but after apologizing, he touched JJ's thigh again. JJ was scared, but did not exit the vehicle nor return to her duty section on foot because it was nighttime, and Appellant had driven them some distance from her assigned hangar. Nonetheless, when Appellant eventually drove them back to their duty section, JJ's co-worker JM observed JJ looking "upset" and "stressed." When JM asked JJ why she was so upset, JJ told JM Appellant tried to kiss her. JJ then cried and said she did not want to go back to work.

JJ's boyfriend, GS, corroborated Appellant's sexual interest in JJ. He testified that in workplace conversations with Appellant, Appellant would refer to JJ as "our girl." GS also verified that JJ reported to him that Appellant recurrently tried to "flirt with her in the car [*i.e.*, the work vehicle Appellant used to make maintenance 'runs' with JJ]" and that Appellant had tried to kiss JJ. Finally, Appellant himself apologized to GS for "trying to get at [JJ] when [GS] was with her."

To prove the existence of the "duty" to avoid sexual harassment in the Air Force, the Government chose to introduce: (1) testimony of Master Sergeant (MSgt) ML as to Appellant's knowledge of the prohibition against sexual harassment in the Air Force; and (2) a then-expired version of Air Force Instruction (AFI) 36-2706, *Equal Opportunity Program Military and Civilian*, at 1–3 and 11–12 (5 Oct. 2010),[6] defining and prohibiting sexual harassment in the Air Force. These five pages from the AFI make up what was admitted as Prosecution Exhibit 13.

MSgt ML was Appellant's flight chief during the charged timeframe, and she generally managed personnel and operations within the weapons maintenance section. She testified as to Appellant's training and experience which would have informed him to refrain from sexual harassment. She testified that Appellant was an "Expediter" for the squadron's mid shift (typically scheduled from 2300 to 0700 or 0800 hours). When Appellant was an Expediter on mid shifts, he was in charge of junior enlisted Airmen on the same shift, to include JJ. Normally there was no senior leadership on mid shifts—technical sergeants were generally the highest-ranking Airmen on shift. MSgt ML further ex-

---

[6] We take judicial notice of domestic law that this Air Force Instruction (AFI) 36-2706 was superseded by Department of the Air Force (DAFI) 36-2710, *Equal Opportunity Program* (18 Jun. 2020). *See* Mil. R. Evid. 202(a).

plained that as an Expediter, Appellant would have gone through annual expediter training, supervisory training, upgrade training, and task certification training—all of which would have notified Appellant of the prohibition against sexual harassment. It was her opinion that due to those trainings, Appellant would have known "he was not to sexually harass junior enlisted Airmen." She further testified that about 10 to 11 years ago there was a culture shift in the Air Force that made "locker room talk" no longer acceptable and that it would be unacceptable and inappropriate for a technical sergeant to speak to junior enlisted Airmen about wanting to have sex with them or to engage in other sexual comments.

The Government offered, and the military judge admitted, with no objection from the Defense, pages 1–3 and 11–12 of AFI 36-2706 as Prosecution Exhibit 13. This excerpt included the cover page and table of contents, as well paragraph 1.2 entitled "Prohibition of Sexual Harassment." Paragraph 1.2.1 then provided the following definition for sexual harassment:

> [U]nwelcome sexual advances, requests of sexual favors, or other verbal or physical conduct of a sexual nature particularly when submission to such conduct is made directly or indirectly as a term or condition of employment, and/or when submission to or rejection of such conduct is used as a basis for an employment decision affecting the person. Unlawful harassment also includes creating an intimidating, hostile working environment.

The military judge declined to take judicial notice of Prosecution Exhibit 13, noting that the version of AFI 36-2706 admitted into evidence had in fact expired prior to the charged misconduct. The Air Force Instruction in effect at the time of Appellant's offense (August 2018) was AFI 36-2706, *Equal Opportunity Program Military and Civilian* (5 Oct. 2010, as amended by AFGM 2017-01, 9 Feb. 2017). However, after noting that "the relevant portions [of the definition of sexual harassment to the 2010 and 2017 versions of AFI 36-2706] don't appear to be impacted,"[7] the military judge constructed a draft instruc-

---

[7] We agree with the military judge's observations on this point, as the definition of sexual harassment in the 2010 AFI tracks with the definition of sexual harassment in the 2017 version which was in effect at the time of the misconduct in August 2018. *See* AFI 36-2706, *Equal Opportunity Program Military and Civilian,* ¶ 1.1.1 (5 Oct. 2010, as amended by AFGM 2017-01 (9 Feb. 2017).

While AFI 36-2706 was superseded on 18 June 2020 by DAFI 36-2710, the current DAFI also tracks the definition of "sexual harassment" in substance, providing only superficial additional verbiage describing the different species of sexual harassment

tion that the members could "consider Prosecution Exhibit 13 only for the limited purpose that's expressed inside the draft instructions, which is its tendency, if any, to demonstrate that there did exist a duty for [Appellant] to refrain from sexually harassing someone."

The military judge's written findings instructions (Appellate Exhibit XXIV) on the instruction of sexual harassment were provided to the members as follows:

> "Sexual harassment" means nonconsensual sexual advances and nonconsensual requests for sexual favors. Other verbal or physical conduct of a sexual nature constitutes "sexual harassment" when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to, or rejection of, such conduct by an individual is used as the basis for employment decisions affecting such an individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

> To establish that "sexual harassment" occurred based on the nature of the working environment, the [G]overnment must prove that the accused's actions created a working environment that was intimidating, hostile, or offensive when viewed objectively under all the circumstances.

## II. DISCUSSION

### A. Admissibility of Expired Service Regulation

Prior to turning to address the challenge to the legal and factual sufficiency of Appellant's conviction, we consider the admissibility of some of the key evidence in support of that conviction, namely, the excerpt from the October 2010 version of AFI 36-2706. Appellant argues that even absent any objection to the admission of the excerpt of the then expired version of AFI 36-2706 at trial, its admission was still plain error because it was incompetent evidence to prove the existence of a military duty. Even assuming arguendo that Appellant's explicit "no objection" merely forfeited, vice waived, this issue, we still find no error, plain or otherwise, in the admission of the excerpt of AFI 36-2706.

---

behavior (*i.e.,* quid pro quo or hostile work environment) categories. *See* DAFI 36-2710, *Equal Opportunity Program* at 265–66 (23 May 2024) (superseding DAFI 36-2710 (18 Jun. 2020)).

### 1. Additional Background

When the military judge asked the Defense if they had any objection to admitting AFI 36-2706 into evidence, the Defense affirmatively said "no." Prior to closing argument, the military judge instructed the members that they could only consider Prosecution Exhibit 13 for the "limited purpose of its tendency, if any, to prove the existence of a duty prohibiting sexual harassment and the accused's knowledge of that duty." The military judge further instructed the members that they "must apply only the statement of the law [the military judge has] provided within these instructions during [their] deliberations." While trial defense counsel initially objected to that instruction, after further discussion of the issue during an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, trial defense counsel affirmatively withdrew their objection.

### 2. Law

#### a. Waiver and Forfeiture

Counsel declining to raise an objection when specifically invited by the military judge may constitute waiver. *United States v. Davis*, 79 M.J. 329, 331–32 (C.A.A.F. 2019). Nonetheless, as to pre-January 2021 misconduct, Courts of Criminal Appeals (CCAs) have an obligation to review the entire record and the authority to "leave [Appellant's] waiver intact, or to correct the error." *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citation omitted). "[W]e will only ignore an affirmative waiver in the most deserving cases." *United States v. Blanks*, No. ACM 38891, 2017 CCA LEXIS 186, at \*22 n.11 (A.F. Ct. Crim. App. 17 Mar. 2017) (unpub. op.) (holding that "[a]ppellant affirmatively waived this issue when he conceded, on the record, that the military judge should grant the Government's challenges for cause").

Should we decide to pierce waiver, forfeited objections as to the military judge's admission of evidence are reviewed for plain error. *United States v. Lopez*, 76 M.J. 151, 154 (C.A.A.F. 2017). Thus, Appellant must show that: (1) there was error; (2) the error was plain or obvious; and (3) the error was materially prejudicial to his substantial rights. *Id.*

#### b. Logical and Legal Relevance

Generally speaking, evidence is admissible if it is relevant and if the probative value is not substantially outweighed by the danger of, *inter alia*, unfair prejudice, confusing the issues, or misleading the court members. Mil R. Evid. 401, 403. Relevance is a low bar and exists if the evidence has "any tendency to make a fact [of consequence] more or less likely." Mil. R. Evid. 401. *United States v. Guihama*, 85 M.J. 48, 55 (C.A.A.F. 2024) ("The relevance standard is a low threshold." (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (additional citation omitted)); *see also* MILITARY RULES OF EVIDENCE MANUAL § 401.02 (2025) ("By using the phrase 'any tendency,' the military

drafters adopted the Federal Rules of Evidence liberal admissibility standard."). Proper limiting instructions are capable of diminishing Mil. R. Evid. 403 concerns that court members will consider permissible evidence in an impermissible way. *See generally United States v. Lusk,* 70 M.J. 278, 281 *(*C.A.A.F. 2011) (holding that limiting instruction mitigated risk of a Sixth Amendment Confrontation Clause[8] violation that members would substantively consider hearsay upon which expert relied to reach his opinion) (citation omitted); *United States v. Bailey*, 55 M.J. 38, 41 (C.A.A.F. 2001) (holding proper limiting instructions mitigate harm from improper consideration of Mil R. Evid. 413 purposes); *United States v. Kerr*, 51 M.J. 401, 406–07 (C.A.A.F. 1999) (holding proper limiting instructions are capable of mitigating harm from potential "spillover" of general considerations of criminal propensity where an accused is charged with multiple offenses at the same trial); Mil. R. Evid. 105 (requiring limiting instructions for evidence admitted for a limited purpose).

### 3. Analysis

Here Appellant invites us to pierce any putative waiver of this issue because the underlying evidence admitted ended up being a central component of the Government's proof for the source of the duty to refrain from sexual harassment. While waiver may well attach to circumstances such as these where the military judge specifically calls upon Appellant to offer any objections to admission of a particular piece of evidence and Appellant declines (*see, e.g., Davis*, 79 M.J. at 331–32) (finding waiver where counsel affirmatively declined any tailored findings instructions)), here we deem it prudent to assume without deciding that this issue was merely forfeited (vice waived). We do so because it allows us to explain that, regardless of whether this objection was waived or forfeited, under the circumstances the excerpt from AFI 36-2706 (Prosecution Exhibit 13) was properly admitted because it was relevant to the central issue at this case now on appeal, *i.e.*, whether there was sufficient proof of "custom" as a source of a duty to refrain from sexual harassment in the Air Force.

We of course begin with relevance. The relevance bar is a modest one, defining relevance as "any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." Mil. R. Evid. 401; *see Guihama*, 85 M.J. at 55. Insofar as custom of the service was one of the viable theories for how the Government could prove the duty to refrain from sexual harassment in the Air Force,[9] the relevance inquiry for

---

[8] U.S. CONST. amend. VI.

[9] *See* 2016 *MCM*, pt. IV, ¶ 16.c.(3)(a) ("A duty may be imposed by treaty, statute, regulation, lawful order, standard operating procedure, or custom of the service.").

admission of the expired excerpt of AFI 36-2706 boils down to this: whether the excerpt of the October 2010 instruction had any tendency to demonstrate a long-established practice whose common usage attaining the force of law within the Air Force. That answer is yes. First, the fact is that the definition of sexual harassment as defined in that excerpt had been in existence since at least 2010. And considering that this longstanding definition hewed so closely to the testimony of MSgt ML (who averred that the same prohibitions were recognized and all personnel, particularly supervisors, trained upon those prohibitions), this made it more likely that the prohibition against sexual harassment was a long-established practice whose common usage had attained the force of law. Those attributes were directly relevant to the trier of fact determining whether a duty existed by virtue of a custom of the service. *See* our opinion's discussion of the law of custom, *infra* at section II.B.2.a.

Turning to whether this otherwise relevant evidence should have been excluded on Mil. R. Evid. 403 grounds—we think not. Here, while there was arguably some risk for confusion for the court members as to what purpose they could consider this expired service regulation, the military judge's tailored findings instructions sufficiently alleviated that concern. His instructions were clear and specific concerning the limited use for which the court members should consider the expired AFI excerpt (Prosecution Exhibit 13). The military judge then provided a separate specific instruction, ratified by trial defense counsel, concerning the legal definition of sexual harassment pertinent to trial. Appellant has waived any objection to those objections by ratifying those instructions at trial. *See* our discussion at section II.B.3, *infra*. In any event, we conclude the military judge did not commit error because he did not abuse his discretion in providing those tailored and accurate instructions in the first instance.

## B. Legal and Factual Sufficiency

Of course, the fact that the Government's evidence was admissible does not itself establish the factual and legal sufficiency of Appellant's conviction. Here, Appellant argues that his conviction is factually insufficient because: (1) the Government offered insufficient proof of the existence of a duty to refrain from sexual harassment and that Appellant knew of that duty; and (2) even if the Government proved a duty existed and Appellant knew of it, JJ's factual allegations of sexual harassment are unreliable because she lacks credibility. Ultimately, we are unpersuaded by either of these arguments.

### 1. Law

We review issues of factual sufficiency for pre-January 2021 misconduct de novo. *See United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Likewise, we review the legal sufficiency of a conviction de novo.

*United States v. Harrington,* 83 M.J. 408, 414 (C.A.A.F. 2023) (citing *United States v. King,* 78 M.J. 218, 221 (C.A.A.F. 2019)). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). "This deferential standard impinges upon the factfinder's discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Mendoza*, 85 M.J. 213, 217 (C.A.A.F. 2024) (internal quotation marks and citation omitted).

For trials involving any convicted offenses committed before January 2021, "[t]he test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (third alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) (construing the pre-January 2021 version of Article 66, UCMJ)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

### 2. Dereliction of Duty

To find Appellant guilty of dereliction of duty, a violation of Article 92, UCMJ, the Government was required to prove, beyond a reasonable doubt, that (1) Appellant had a duty to refrain from sexually harassing JJ, (2) he knew of this duty, and (3) he was willfully derelict in the performance of this duty on divers occasions. *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 16.b.(3).

### a. Source of the Duty

A military duty "may be imposed by treaty, statute, regulation, lawful order, standard operating procedure, or custom of the service." 2016 *MCM*, pt. IV, ¶ 16.c.(3)(a); *United States v. Tanksley*, 36 M.J. 428, 430 (C.M.A. 1993) (citation omitted).

To qualify as a "custom of the service" based duty, the action must satisfy the following requirements: (1) be a long-established practice; (2) whose common usage attaining the force of law; (3) is not contrary to military law; and (4) ceases when observance has been abandoned. *See* 2016 *MCM*, pt. IV, ¶ 60.c.(2)(b) (defining "custom" in the context of an Article 134 violation);[10] *see also United States v. Shamess*, No ACM 39434, 2019 CCA LEXIS 339, at *44 (A.F. Ct. Crim. App. 23 Aug. 2019) (unpub. op.) (observing that a custom is a "[h]abitual practice or course of action that characteristically is repeated in like circumstances") (quoting "Custom," BLACK'S LAW DICTIONARY (6th ed. 1990)).

Competent proof of custom of the service could include "testimony [ ] offered by a knowledgeable witness—subject to cross-examination—about that custom." *United States v. Wales*, 31 M.J. 301, 309 (C.M.A. 1990). Equivocal or merely conclusory comments from a supporting witness fail to meet the *Wales* standard. *See, e.g.*, *United States v. Fox*, 34 M.J. 99, 103 (C.M.A. 1992) (holding that the Government failed to carry its burden to prove a custom of the service where they relied on conclusory and generic testimony that "[fraternization] pretty much applies to the way in which an officer and enlisted personnel relate to one another and at what point does it cross a boundary of socializing"); *United States v. Washington*, No. ACM 39761, 2021 CCA LEXIS 379, at *41 (A.F. Ct. Crim. App. 30 Jul. 2021) (unpub. op.) (holding the equivocal testimony from a witness there was a custom against fraternization generally, but that levels of acceptable social drinking with subordinates were more fluid was legally insufficient to constitute evidence of custom of the service) (citing *Wales*,

---

[10] The 2016 *MCM* specifically describes the contours of a custom as follows:

> In its legal sense, "custom" means more than a method of procedure or a mode of conduct or behavior which is merely of frequent or usual occurrence. Custom arises out of long established practices which by common usage have attained the force of law in the military or other community affected by them. No custom may be contrary to existing law or regulation. A custom which has not been adopted by existing statute or regulation ceases to exist when its observance has been generally abandoned. Many customs of the Service are now set forth in regulations of the various armed forces.

pt. IV, ¶ 60.c.(2)(b).

31 M.J. at 309)); *rev. granted*, 2024 CAAF LEXIS 784 (C.A.A.F. 26 Mar. 2025). By contrast, "concrete and specific" testimony from a knowledgeable witness, standing alone, is sufficient to establish proof of a custom of the service. *See Shamess*, unpub. op. at *29 (holding a NCO's testimony sufficient to prove the custom in the Air Force prohibiting sexual relationship between officer and enlisted personnel). Relatedly, our superior court has repeatedly reaffirmed the axiom that "the testimony of only one witness may be enough to meet this burden so long as the members find that the witness's testimony is relevant and is sufficiently credible." *United States v. Rodriguez-Rivera*, 63 M.J. 372, 383 (C.A.A.F. 2006) (citations omitted).

Customs of the service may be further evidenced by their codification or recognition in service regulations. *See generally* AFI 1-1, *Air Force Standards* ¶ 2.8.3 (18 Aug. 2023) (codifying various Air Force customs including prohibition against sexual harassment); *see also United States v. Risner*, No. 200501643, 2006 CCA LEXIS 226, at *6–7 (N.M. Ct. Crim. App. 9 Aug. 2006) (unpub. op.) (finding Marine Corps duty to prevent underage consumption of alcohol by subordinate NCOs pursuant to a base order established in part by custom of the service); *United States v. Hode,* 44 M.J. 816, 818 (A.F. Ct. Crim. App. 1996) (finding Air Force Alcoholic Beverage Program was not punitive but did create the basis for a military duty enforceable via Article 92(3), UCMJ). Even obsolete service regulations could be circumstantial evidence of a duty because regulations are generally understood as codifying service customs. *Cf. United States v. Appel*, 31 M.J. 314, 320 (C.M.A. 1990) ("[T]his Court has suggested on two prior occasions that, in dealing with fraternization, the armed services might profitably consider issuing punitive regulations to define some relationships which are especially harmful to military discipline." (citations omitted)); *United States v. Pitasi,* 44 C.M.R. 31, 38 (C.M.A. 1971) ("While the drafting of an appropriate regulation might be difficult, we recommend it to the responsible military authorities.").

Finally, evidence of a custom is also demonstrable through its incorporation into military training. *See United States v. Boyett,* 42 M.J. 150, 155 (C.A.A.F. 1994) (holding appellant's reserve officer training reasonably established a custom against fraternization and reasonably put him on notice of that custom).[11]

---

[11] We note further that the 2016 *MCM* in effect at the time of Appellant's misconduct codified a prohibition against sexual harassment, with the President articulating sexual harassment as a form of "maltreatment" for purposes of Article 93, UCMJ, 10 U.S.C. § 893, as follows:

### b. Sexual Harassment Service Regulations

During the period of Appellant's convicted sexual harassment of JJ from August 2018 to December 2018, sexual harassment in the Air Force was proscribed by both a Department of Defense Instruction (DoDI) and an Air Force Instruction, to wit: DoDI 1020.03, *Harassment Prevention and Response in the Armed Forces* (8 Feb. 2018), and AFI 36-2706 (9 Feb. 2017). Paragraph 1.2(c) of DODI 1020.03 mandated that "Military Departments will incorporate the definitions in the Glossary of this issuance into their respective harassment prevention and response implementing regulations," and in turn defined sexual harassment as, *inter alia*:

(1) Conduct that:

(a) Involves unwelcome sexual advances, requests for sexual favors, and deliberate or repeated offensive comments or gestures of a sexual nature when:

1. Submission to such conduct is made either explicitly or implicitly a term or condition of a person's job, pay, or career;

2. Submission to or rejection of such conduct by a person is used as a basis for career or employment decisions affecting that person; or

3. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creates an intimidating, hostile, or offensive environment; and

(b) Is so severe or pervasive that a reasonable person would perceive, and the victim does perceive, the environment as hostile or offensive.

. . . .

---

[S]exual harassment may constitute this offense. Sexual harassment includes influencing, offering to influence, or threatening the career, pay, or job of another person in exchange for sexual favors, and deliberate or repeated offensive comments or gestures of a sexual nature. The imposition of necessary or proper duties and the exaction of their performance does not constitute this offense even though the duties are arduous or hazardous or both.

2016 *MCM,* pt. IV, ¶ 17.c.(2).

> (3) Any deliberate or repeated unwelcome verbal comments or gestures of a sexual nature by any member of the Armed Forces or civilian employee of the Department of Defense.

DoDI 1020.03, ¶ 3.3. For its part, AFI 36-2706, promulgated prior to the DoDI, but still unamended at the time of Appellant's misconduct, defined sexual harassment in the Air Force as:

> Unlawful sexual harassment includes unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature particularly when submission to such conduct is made directly or indirectly as a term or condition of employment, and/or when submission to or rejection of such conduct is used as a basis for an employment decision affecting the person. Unlawful harassment includes creating an intimidating, hostile working environment for another person on the basis of race, color, religion, sex (including pregnancy, gender identity, and sexual orientation), national origin, age (40 or older), disability, genetic information, or reprisal.[12]

AFI 36-2706 (9 Feb. 2017), at Attachment, ¶ 1.1.1.

---

[12] In acknowledging this existing regulation, we are not taking judicial notice per se, rather we are merely performing the inherent appellate function of ascertaining the law applicable to the elements of the charged offense. Here, we acknowledge the existence of these regulations solely for the purposes of comparing the custom of sexual harassment as described by MSgt ML and set forth in the lapsed version of AFI 36-2706 (5 Oct. 2010) admitted at trial as Prosecution Exhibit 13, and ascertaining whether Appellant's verbal and physical sexual advances towards JJ violated "long established practices which by common usage have attained the force of law in the military or other community affected by them."

In so doing, we do not relieve the Government of its burden to prove, beyond a reasonable doubt, the existence of a duty to refrain from sexual harassment. The law does not permit a factfinder, or this court, to presume the existence of a duty in the absence of properly admitted evidence. *See United States v. Paul*, 73 M.J. 274, 279 (C.A.A.F. 2014) (holding a Court of Criminal Appeals conducting legal and factual sufficiency review cannot take judicial notice of an element of an offense, even when that judicial notice extends to matters otherwise eligible for judicial notice as domestic law). We are aware the existence of a duty as a matter of *law* does not resolve the separate issue of whether the Government proved that duty as a matter of *fact*. *See United States v. Henderson*, No. ACM 40719, 2025 CCA LEXIS 172, *18–19 (A.F. Ct. Crim. App. 18 Apr. 2025) (unpub. op.) (holding that Appellant's Article 92(1), UCMJ, 10 U.S.C. § 892(1), convictions were factually insufficient where successive versions of the lawful general regulation concerned were in existence during the entirety of Appellant's misconduct, but the Government failed to offer sufficient proof of that fact at trial).

In ascertaining whether an appellant created a hostile work environment, our superior court has focused "on the personal interactions at issue to determine whether the remarks [are] 'unwelcome[ ].'" *United States v. Brown*, 55 M.J. 375, 384–85 (C.A.A.F. 2001). With respect to statements amongst coworkers, our superior court has recognized "it is necessary to examine the nature of the interaction between the parties to the conversation to determine whether the person making the remarks had reasonable notice that the comments would be regarded as unwelcome . . . ." *Id.* at 385. Importantly, while "co-workers may be offended from time to time by the behavior of their colleagues," to qualify as criminal conduct, the unwelcome behavior must be "so severe or pervasive that it creates a hostile work environment." *Id.*

### c. Knowledge of the Duty

To satisfy the first element of a dereliction of duty offense, the evidence must demonstrate the existence of a duty, beyond a reasonable doubt. *See United States v. Hays*, 71 M.J. 112, 113–14 (C.A.A.F. 2012); *Tanksley*, 36 M.J. at 430 (citation omitted). The Government's burden of proof as to knowledge is either that Appellant knew or should have known of his duties. 2016 *MCM*, pt. IV, ¶ 16.c.(3)(b) ("Actual knowledge need not be shown if the individual reasonably should have known of the duties."). However, the Government need not prove an accused was aware of the precise source of his duty. *See United States v. Markley*, 40 M.J. 581, 582 (A.F.C.M.R. 1993). "[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted). Finally, knowledge or constructive knowledge of a duty may also be proved by direct or circumstantial evidence, including but not limited to service regulations, training or operating manuals, customs of the service, academic literature or testimony, or testimony of persons who have held similar or superior positions to the accused. *See* 2016 *MCM*, pt. IV, ¶ 16.c.(3)(b).

### 3. Analysis

As a starting point, we note that Appellant's allegation of legal insufficiency is based in part upon an assertion of error which Appellant *waived*: namely, that the military judge committed instructional error by using an erroneous definition for "sexual harassment." Specifically, Appellant alleges that the military judge erred in substituting the word "nonconsensual" for the word "unwelcome,"[13] and omitting the terms "pervasive" and "severe" in describing the course of conduct necessary to prove a hostile work environment. Appellant did not object to those instructions at trial, and in fact, affirmatively agreed with

---

[13] We note Appellant explicitly argued for and agreed with inclusion of the word "nonconsensual" in the instruction concerned.

them. Accordingly, he waived any objections thereto. *See Davis,* 79 M.J. at 331–32. Moreover, we decline his invitation that we essentially conflate alleged instructional error with a species of legal and factual insufficiency.[14]

Nonetheless, here, for simplicity's sake, we will assume arguendo that Appellant's view of the law is correct and that the DoDI 1020.03 definition of sexual harassment was binding upon the Air Force at the time of Appellant's charged misconduct.[15] The issue then becomes whether the Government's proof at trial, which included neither the DoDI nor the current version of the AFI at the time (*i.e.*, 9 Feb. 2017) prohibiting sexual harassment, was sufficient to prove the existence of a duty to refrain from sexual harassment in the Air Force. Appellant would essentially have us conclude that the Government cannot rely upon the 2010 version of AFI 36-2706 because it was expired and could not rely upon MSgt ML's testimony as proof as custom of the service because the Government did not ascribe that moniker of "custom of the service" to it at trial. We decline Appellant's invitation to champion form over substance.

---

[14] Even aside from waiver, such an assertion fundamentally confuses the issue of alleged instructional error with factual and legal sufficiency. Appellant would have it that if the court members were instructed as to the wrong legal standard that we cannot affirm a conviction. Not so. First of all, instructional error itself is tested for prejudice. *See United States v. Ober*, 66 M.J. 393, 406 (C.A.A.F. 2006) (holding no prejudice from military judge omitting words from a findings instruction because Appellant did not demonstrate how that omission would have had a prejudicial impact on the court members by inviting them to convict on an erroneous theory of liability). Secondly, the factual and legal sufficiency analysis is distinct from an instructional error analysis. This is so because the law is what the law is. In reviewing the factual and legal sufficiency of a conviction we are not limited to statements of putative law in the military judge's instructions, but rather, we have the independent obligation under Article 66(d), UCMJ, 10 U.S.C. § 866(d), to determine what the law is—and then evaluate the legal and factual sufficiency of the evidence in light of the correct law as we find it. Thus, even if we agreed with Appellant's assertions that the military judge mis-defined "sexual harassment" in his findings instructions (which we do not), that alone would not inhibit us from applying the appropriate definition now on appeal.

[15] In comparing the definitions of sexual harassment from the various Department of Defense and Air Force instructions cited above, we conclude as a matter of law that these definitions are substantially similar. Moreover, for reasons explained *infra* in our analysis, to the extent that the DoDI definition explicitly included the terms "pervasive" and "severe" in describing sexual harassment via a hostile work environment, we have reviewed the evidence in this case through that filter and conclude that Appellant's nonconsensual sexual advances towards JJ were both pervasive and, under the circumstances, severe (given the explicitness of the advances and the rank and power disparity between Appellant and JJ).

Ultimately, for purposes of accessing legal and factual sufficiency, we are not constrained by monikers ascribed at trial, but rather we are empowered to conduct an independent assessment of the underlying evidence itself. *See Shamess*, unpub. op. at \*29 ("Although [MSgt JP] did not use the specific term 'custom,' we find her testimony sufficiently described the plain meaning of that term."). The Government complicated their presentation of evidence by opting for perhaps the most difficult route possible to prove their case—presenting evidence of an expired service regulation proscribing sexual harassment, accompanied by a senior NCO's testimony that the substance of that service regulation was recognized and enforced in training and in practice in Appellant's squadron at the time of the charged misconduct. However, the Government was not required to choose the easier and more obvious routes in proving the existence of a military duty via statutes and regulations then in effect. Instead, the question on appeal is simply whether the Government's evidence was competent to prove the existence of a duty via a method specifically authorized by Article 92, UCMJ, *i.e.*, "custom of the service"—we hold in the affirmative.

In sum, the fact that the Government did not explicitly reference in argument at trial that the source of the duty was a military custom does not constrain us from concluding that the evidence at trial was legally and factually sufficient. In the end, for the reasons set forth below, we conclude beyond a reasonable doubt that a duty to refrain from sexual harassment in the Air Force exists by virtue of, *inter alia*, custom of the service, that the Government proved that custom at trial, and that Appellant's actions constituted willful violation of that duty by sexually harassing a junior Airman under his direct supervision: JJ.

### a. Insufficient Proof of Duty Imposed by Regulation

We reiterate that the threshold issue in this case is what constitutes cognizable evidence of a "custom of the service" to demonstrate the existence of a military duty. Here, the Government (perhaps inadvertently) limited itself to proof of a duty by "custom of the service" because it neglected to offer readily available proof of the current version of the service regulation codifying the prohibition against sexual harassment under federal law as applied to the Air Force specifically. We agree with Appellant that the Government's offer of an expired version of AFI 36-2706 was insufficient, in and of itself, to prove the existence of a duty as established by service regulation in effect at the time of the misconduct. *See Untied States v. Henderson*, No. ACM 40719, 2025 CCA LEXIS 172, \*18–19 (A.F. Ct. Crim. App. 18 Apr. 2025) (unpub. op.).

### b. Sufficient Proof of Duty Imposed by Custom of the Air Force

Having determined the regulation relied upon by the Government did not independently establish a duty (because it was expired), we turn to whether there was nonetheless evidence of a duty based on a custom of the Air Force.

Unlike *Henderson*, here the Government's proof was *not* limited to an expired regulation to establish the duty; it was buttressed by testimony from a competent witness with a specific basis for knowledge of the long-established practice against sexual harassment in the Air Force and Appellant's squadron, in particular. While we acknowledge that neither MSgt ML nor trial counsel categorized her testimony as proof of a "custom of the service," the absence of an applicable moniker at trial does not limit our consideration of that evidence for all admissible purposes on appeal.

Here the expired service regulation still provided circumstantial evidence that of a custom of the service against sexual harassment in effect at the time of Appellant's misconduct. Specifically, the regulation provided some corroboration of MSgt ML's testimony that the prohibition against sexual harassment was a custom of the service in the Air Force in effect for at least "the last 11 years." If the definition of sexual harassment, and the prohibition thereof, remained constant across the updated regulations, then that reinforces that even this obsolete document could be circumstantial evidence of a custom in the Air Force against sexual harassment, so long as the Government had a witness to link that obsolete regulation to current practice, *i.e.*, MSgt ML.

Undeterred, Appellant essentially asserts that the military judge erred in his findings instructions in defining sexual harassment as a "nonconsensual" versus an "unwelcome" advance, and that this error invalidates his conviction because it creates the possibility that the court members convicted on an erroneous theory of liability. This argument is unavailing for several reasons. First, once again, Appellant waived any issue of instructional error by explicitly agreeing with the military judge's instruction at trial. *See Davis,* 79 M.J. at 331–32. Second, any legal or factual distinction between "unwelcome" and "nonconsensual" is de minimis, and if it exits, would only tend to inure to Appellant's favor. It is difficult to conceive of a scenario where a sexual advance was nonconsensual, yet somehow still not "unwelcome." Even if this court could ascertain such an esoteric distinction, as the military judge pointed out at trial, the term nonconsensual had strategic benefits for the Defense by enabling a "mistake of fact as to consent" instruction which was mutually reinforcing of the requirement for an objectively hostile work environment as defined by the military judge. Third, even if this inscrutable distinction between "unwelcome" and "nonconsensual" somehow resulted in the court members being provided with an inaccurate theory of liability of sexual harassment, that would not preclude our separate review of whether, under the correct understanding of the

law, the Government presented proof beyond a reasonable doubt that Appellant's actions constituted sexual harassment within the definition established by service custom and regulation at the time of trial. In short, from a legal or factual sufficiency perspective, we are not bound by any "law of the case" from the military judge in findings instructions. Rather, in this context we have the independent duty to ascertain and apply the elements of the offense *de novo*.

Even applying Appellant's preferred version of the definition of sexual harassment as contained in DoDI 1023.02, we find Appellant's conduct meets that standard. The facts here demonstrate a "hostile work environment" typified by pervasive verbal sexual advances and comments by a superior directed at a subordinate. As a matter of fact, we conclude beyond a reasonable doubt both that the testimony of MSgt ML established that a custom of the Air Force prohibiting that same conduct was in effect at the time of Appellant's misconduct and that Appellant knew of that duty by virtue of recurrent training for supervisors in the squadron on that topic. We further conclude that while evidence of the expired version of AFI 36-2706 was itself insufficient to establish that regulation as a source of the duty, it still corroborates MSgt ML's testimony that "culture shift" in the Air Force against sexualized conversations in the workplace in the Air Force dated back at least "10–11 years." Unlike the generic witness testimony we found unpersuasive in *Washington*, MSgt ML's testimony was specific to the training and culture extant in Appellant's own squadron at the time of his misconduct. Her testimony was sufficiently specific and tailored. *See Shamess*, unpub. op. at *29. MSgt ML's testimony that there was a culture shift about "10 or 11 years ago" regarding "locker room talk" and more generally regarding sexual comments amongst Airmen in the workplace, and that Appellant, as an "Expediter" with trainings commensurate to his pay grade and position, would have known "he was not to sexually harass junior enlisted Airmen" is persuasive and convincing. That conclusion is reinforced by her personal familiarity both with Appellant, and their shared squadron.

### c. JJ's Credibility

Finally, having concluded that MSgt ML's testimony and the expired version of AFI 36-2706 combined provided sufficient proof of a custom of the service against sexual harassment and of Appellant's knowledge of that duty, we turn to Appellant's arguments that JJ's testimony (1) lacks sufficient credibility to be believed; and (2) even if true does not rise to the level of "pervasive" activities such that it constituted "sexual harassment" by creating a "hostile working environment."

First, as a matter of fact and law, JJ's descriptions of Appellant's persistent verbal sexual advances and unsuccessful physical sexual advance, if true, constitute "sexual harassment" within the meaning of the term prohibited by both regulation and custom at the time of his conduct. Once again, the key part of

the applicable definition of sexual harassment is nonconsensual "sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature." While Appellant is correct that the Government did not prove that Appellant's advances were specifically predicated upon explicit threat of adverse career consequences for denying his advances, the definition of sexual harassment as it pertains to service custom, is broader than the quid pro quo form of harassment. Here the evidence demonstrated that Appellant created a hostile work environment by systematically and explicitly initiating sexualized conversations with his subordinate, commenting on her sexual attractiveness with the intent of pursuing sexual relations with her. The fact that there was only one incident where Appellant made physical sexual advances towards JJ does not make his verbal sexual advances towards her any less pervasive. Under the totality of the circumstances and particularly given the E-2 to E-6 rank and power disparity, we conclude Appellant's pervasive sexual advances are sufficiently "severe" from the perspective of an objective observer familiar with all the facts, to constitute a "hostile work environment." In short, a harasser's comments are more "severe" when the rank and power disparity creates a greater sense of intimidation and fear from resisting or reporting.

Second, having reviewed the entire record, we do not share Appellant's concerns that JJ's credibility inhibits us from being firmly convinced that her testimony is true. Perfection is not the standard for witness testimony. Considering the facts de novo we are less concerned with JJ's inconsistencies and more concerned with the corroboration of the major details of her testimony, and the absence of any convincing motive for her to fabricate her testimony. Multiple witnesses verified JJ's assertions that, unique to JJ, Appellant would take her, a junior Airman, unnecessarily on maintenance runs that should have taken minutes but extended for hours. This created ample opportunity for Appellant's sexualized advances. JM corroborates JJ's emotional distress after she immediately reported Appellant's attempted unwanted kiss against her.

Appellant invites us to dismiss all this evidence principally because: (1) during her initial interview with OSI she denied that Appellant ever sexually touched or harassed her; and (2) she harbored a motive to fabricate because her then boyfriend GS reportedly became upset when he learned of Appellant's alleged advances towards her. However, JJ provided a convincing explanation for her initial false statements to OSI—namely, that she intentionally underplayed Appellant's misconduct in that interview because she was pregnant and wanted to be left alone in peace to have her baby without having to contend with ongoing requests to participate in an investigation. Moreover, Appellant himself provides some corroboration for JJ's testimony. By his own admission to JJ's then boyfriend, and as testified to by GS at trial, Appellant apologized for "trying to get at [*i.e.*, initiate a romantic/sexual relationship with]" JJ. In light of this corroboration of JJ's core allegations, the evidence is

legally sufficient because a reasonable trier of fact, drawing all reasonable inferences in favor of the Government's evidence, could reasonably conclude that any imperfections or inconsistencies in JJ's testimony do not disturb the underlying credibility of her testimony describing Appellant's sexual harassment of her. Likewise, as a matter of factual sufficiency, having reviewed all the evidence and testimony admitted at trial de novo with neither an inference of guilt nor innocence, we are persuaded of Appellant's guilt, beyond a reasonable doubt.

## C. Appellate Delay

### 1. Procedural Background

Appellant was sentenced on 22 April 2022. Thereafter, the military judge entered judgment in this case on 26 May 2022. Appellant's case was first reviewed by a judge advocate within the office of the general court-martial convening authority (GCMCA) pursuant to Article 65(d), UCMJ, 10 U.S.C. § 865(d), on 29 June 2022, which determined the findings and sentence in Appellant's case were correct in law and fact. On 23 December 2022, Congress amended Articles 66 and 69, UCMJ, 10 U.S.C. §§ 866, 869.[16] As amended, Article 66(b)(1)(A), UCMJ, expanded the service Courts of Criminal Appeals' jurisdiction to any judgment of a special or general court-martial, irrespective of sentence, that included a finding of guilty. 10 U.S.C. § 866(b)(1)(A) (*Manual for Courts-Martial, United States* (2024 ed.)).

For reasons unexplained in the record, Appellant did not receive notice of the conclusion of the Article 65(d), UCMJ, review in his case until 5 April 2023, and he did not receive notice of his right to file a direct appeal with this court until 28 November 2023.[17] Once notified of the latter, Appellant then duly submitted his notice of direct appeal with this court on 15 December 2023. In all,

---

[16] The National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, § 544, 136 Stat. 2395, 2582–84 (23 Dec. 2022).

[17] Relatedly, after the office of the GCMCA concluded their Article 65(d), UCMJ, review, Appellant filed an Article 69, UCMJ, appeal with the office of The Judge Advocate General of the Air Force (TJAG) on 26 June 2023. However, that appeal was ultimately returned to Appellant with no action because Appellant's case had since become subject to "direct appeal" to this court pursuant to Article 66(b)(1)(A), UCMJ (2024 *MCM*); *see also United States v. Vanzant*, 84 M.J. 671, 676 (A.F. Ct. Crim. App. 2023) (holding the appellant's case still qualified for "direct appeal" under the amended Article 66(b)(1)(A), UCMJ, because the appellant had not submitted his case for Article 69, UCMJ, review by TJAG prior to the effective date of the Article 66(b)(1)(A), UCMJ, "direct appeal" amendment (that being, 23 December 2022)), *rev. granted*, 85 M.J. 198 (C.A.A.F. 2024).

there was a 607-day delay between Appellant's sentencing at trial and the docketing of Appellant's case with this court on 19 December 2023.

Once Appellant's case was docketed, a further 19 months of delay ensued. The reasons for that delay include: the time required for the Government to compile and deliver the record of trial to Appellant and this court—not accomplished until 13 June 2024;[18] the time required for Appellant to file his brief—filed with this court on 23 October 2024; the time required for the Government to file its answer on 22 November 2024; the time required for Appellant to file his reply brief on 2 December 2024; and finally the time required for this court to review the case and render an opinion. In the interim, Appellant filed two pro forma demands for speedy appellate review. However, neither of these demands articulated any particularized prejudice appertaining to Appellant as a consequence of ongoing appellate review in this case.[19] Finally, as part of his appeal, Appellant filed a declaration in support of his assignment of error that he had been denied speedy appellate processing. However, in that declaration (dated 23 October 2024) Appellant ascribed the prejudice he suffered not to his appellate delay but rather to his underlying conviction itself, asserting: "the consequences of my conviction were catastrophic." Amongst those consequences Appellant recounts his administrative discharge from the Air Force following his conviction; "the whispers, the gossip" his family has heard concerning his conviction; the emotional impact of being in confinement when his beloved grandmother died; all culminating in Appellant's self-assessment that "wrongful conviction has left [him] with [post-traumatic stress syndrome], anxiety, and depression."[20]

### 2. Law

"[C]onvicted service members have a due process right to timely review and appeal of courts-martial convictions." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (first citing *United States v. Toohey*, 60 M.J. 100, 101 (C.A.A.F. 2004); then citing *Diaz v. Judge Advocate General of the Navy*, 59 M.J. 34, 37–38 (C.A.A.F. 2003)). Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Prasad*, 80 M.J. 23, 29 (C.A.A.F. 2020)

---

[18] The record of trial includes a 1,004-page verbatim transcript, 17 Prosecution Exhibits, one Defense Exhibit, and 24 Appellate Exhibits.

[19] Appellant's demands recite simply: "Appellant further [ ] demands speedy appellate processing."

[20] We respectfully note that Appellant provided no mention that this assessment was a bona fide psychological diagnosis by a mental health professional, nor any supporting statements from treating mental health professionals to that effect.

(citation omitted); *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citation omitted). This court also has separate statutory authority to provide "appropriate relief" if an accused "demonstrates error or excessive delay in the processing of the court-martial after the [entry of judgment]." Article 66(d)(2), UCMJ, 10 U.S.C. § 866(d)(2). Appropriate relief is not synonymous with "meaningful relief." *United States v. Valentin-Andino*, __ M.J. __, No. 24-0208, 2025 CAAF LEXIS 248, at *7 (C.A.A.F. 31 Mar. 2025). Additionally, "[a]lthough it is within a Court of Criminal Appeal's discretion to place its reasoning about Article 66(d)(2)[, UCMJ,] relief on the record, it is not required to do so." *Id.* (citing *United States v. Winckelmann*, 73 M.J. 11, 16 (C.A.A.F. 2013)).

### a. Delay in Between Sentencing and Docketing.

A presumption of unreasonable delay ordinarily arises when a case is docketed more than 150 days from an appellant being sentenced. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citation omitted). However, in the context of "direct appeals" such as Appellant's, a panel of this court previously held in *United States v. Boren* that the 150-day threshold established in *Livak* does not per se apply to direct appeals. *United States v. Boren*, No. ACM 40296 (f rev), 2025 CCA LEXIS 103, at *43 (A.F. Ct. Crim. App. 19 Mar. 2025) (unpub. op.). A presumptively unreasonable delay triggers an analysis of the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (additional citations omitted).

### b. Delay Between Docketing and Appellate Decision

A presumption of unreasonable delay also arises when appellate review is not completed, and a decision is not rendered within 18 months of docketing by this court. *Moreno*, 63 M.J. at 142. This type of unreasonable delay also triggers an analysis of the four *Barker* factors. *Id.* at 135 (citing *Barker*, 407 U.S. at 530). Following *Barker* as interpreted by the various federal circuit courts, *Moreno* identified three cognizable types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or the appellant." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor

will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

### 3. Analysis

Even harkening to *Boren's* conclusion that the 150-day *Livak* benchmark does not apply to direct appeal cases, we still consider the 607-day delay here between sentencing and docketing to be facially unreasonable. The delay in rendering this decision approximately one month beyond the 18-month benchmark from docketing to decision set forth in *Moreno* also renders that portion of appellate delay in this case presumptively unreasonable.

As for the reasons for delay, first, while we do not condone the protracted processing of Appellant's record of trial, the reasons for that delay were unique and understandable (involving an intervening statutory amendment to Article 66(d)(1)(B)(A), UCMJ, impacting internal governmental procedures for the production of verbatim transcripts in previously "sub-jurisdictional" cases, and the retirement of both the military judge and court reporter prior to completion of the record of trial), if not fully reasonable. Likewise, the facially unreasonable portion of the delay pertaining to the issuance of this court's decision is a modest one month beyond the *Moreno* threshold, and the ultimate intricacies of the separate opinions in this case provide good cause for that portion of delay attributable to us.

The third *Barker* factor does weigh in Appellant's favor, but only slightly in our judgment given Appellant's mere pro forma style demands.

As to the fourth and final *Barker* factor, prejudice—we find none. Here there is not even an allegation in Appellant's post-trial declaration of any of the three species of prejudice articulated in *Moreno*. Considering the totality of the circumstances, the delays, separately and collectively, are not so egregious as to adversely affect the public's perception of the fairness and integrity of the military justice system, and thus we find no due process violation. *See Toohey*, 63 M.J. at 362.

Finally, while cognizant of our specific statutory authority to apportion "appropriate relief" for delays in post-trial processing, in the absence of a due process violation, we deem no relief is "appropriate" under Article 66(d)(2), UCMJ.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.


GRUEN, Judge (dissenting):

I cannot concur with my esteemed colleagues regarding their conclusion that the conviction for dereliction of duty is factually sufficient because I do not agree the Government sufficiently proved their case beyond a reasonable doubt. Specifically, the majority opinion assumes a duty to not sexually harass exists and fills in the deficiencies in the Government's proof of such a duty and knowledge by Appellant of such duty by taking judicial notice of certain matters that were not sufficiently proved by the Government during the trial. Further, the majority goes so far as to create a theory of sexual harassment based on custom of the Air Force to justify the conviction when custom of the Air Force formed no part of the Government's theory at trial—the words "custom of the Air Force" do not appear anywhere in the record of trial. Additionally, my colleagues lend more credibility to witness testimony than I afford. More importantly, my colleagues do not address the fact that a proper instruction on findings must have included the correct definition of sexual harassment, which was integral to achieving a legally and factually sufficient conviction. Because I find the military judge made fatal flaws in drafting the definition of sexual harassment in his findings instructions to the members, I would find the conviction legally insufficient and forego addressing factual sufficiency as moot. Therefore, I respectfully dissent as to issue (1) and would SET ASIDE the findings and sentence and return the record of trial to The Judge Advocate General of the Air Force authorizing a rehearing.[1]


### I. BACKGROUND

Appellant's sole conviction pertains to his conduct towards JJ, a junior enlisted Airman who alleged that Appellant sexually harassed her during the time they worked mid-shifts together. Because Appellant was charged with having been derelict in his duty to not sexually harass another Airman, the legal meaning of sexual harassment was crucial to a determination of guilt or

---

[1] *See* Article 66(f)((1)(A)(ii), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(f)(1)(A)(ii) (*Manual for Courts-Martial, United States* (2019 ed.) (2019 *MCM*). Unless otherwise noted, all references to the UCMJ and Rules for Courts-Martial are to the 2019 *MCM*.

innocence at trial. At the time of trial it was clear there existed multiple definitions of sexual harassment in statutes and Air Force regulations. The military judge acknowledged this when refusing to take judicial notice of excerpts of Air Force Instruction (AFI) 36-2706, *Equal Opportunity Program Military and Civilian*, at 1–3, 11–12 (5 Oct. 2010), which he had admitted as Prosecution Exhibit 13 (PE 13). Specifically, he stated he would not take judicial notice of an AFI that was obsolete at the time of the alleged crimes, and which had since been amended multiple times. The military judge ultimately crafted and provided a definition in his findings instructions to the members.

The Government offered, and the military judge admitted as PE 13, with no objection from the Defense, excerpts of AFI 36-2706. The excerpts totaled five pages but did not include Attachment 1 of the AFI, which provided a full definition of sexual harassment. Attachment 1 states:

> Harassment on the basis of sex is a violation of Title VII of the Civil Rights Act of 1964. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

AFI 36-2706 (5 Oct. 2010), Attachment 1.

During discussions with counsel, the military judge contemplated taking judicial notice of the excerpted portions of AFI 36-2706 that comprised PE 13. The military judge contemplated the effect of his instructions on the law in light of the instruction stating:

> I told them [the members] so many times that I instruct you what the law is and if I give them elements, and they don't include this [PE 13], there might be some cognitive dissonance from the members. So, what I am inclined to do is take judicial notice of it, because I can do that at any time. And then, give them a very brief instruction that doesn't say they have to, but they can accept it and use it in weighing and evaluating the remainder of the evidence.
>
> What the language would really be like is, "I have taken judicial notice of a portion of," and then I would identify it. In particular, the portion collected in [PE] 13, and then it would say, "this

means you are permitted to recognize and consider these por-
tions of law without further proof. You may consider this infor-
mation in determining the weight and significance, if any, to be
given to the other evidence and testimony in this case."

Neither trial counsel nor trial defense counsel objected to the military
judge's proposed course of action or instruction. The next morning, again when
discussing instructions with counsel, the military judge stated:

Now, you may have noticed I did not have an instruction in there
for taking judicial notice. Upon inquiry last night, I do not be-
lieve that that is the version of the AFI [36-2706] that would
have been in force and effect at the time of the allegations in this
case. At a minimum, it's missing an interim change that was ac-
complished—it's called Change 1, as of 5 October 2011. There's
also an Air Force Guidance Memorandum, dated 20 September
2011, and then they refer to as well some policy guidance from
[the Air Force Directorate on Manpower, Personnel, and Ser-
vices], dated 7 June 2012, in a cover letter that I have from the
reissuance of the 9 February 2017 version, which was reissued
on the 20th of January 2019.

Suffice it to say, there was no objection from the [D]efense. The
members have had this document [(PE 13)] throughout the
course of the trial, since the very beginning. I am not inclined to
take judicial notice—although the relevant portions don't seem
to be impacted, I would highlight that even the excerpt that the
[G]overnment has provided has, in one of the relevant para-
graphs, a reference out to "See Attachment 1 for full definition"
and *then there's no Attachment 1 in [PE 13]*. So even if I were to
try to take judicial notice from some portion of this, I would have
to be importing some additional definitions for clarity, or ruling
out portions and say "see this other part."

(Emphasis added).

The military judge then explained that instead of taking judicial notice he
constructed a draft instruction that "the members can consider [PE 13] only
for the limited purpose that's expressed inside the draft instructions, which is
its tendency, if any, to demonstrate that there did exist a duty for [Appellant]
to refrain from sexually harassing someone."

Appellate Exhibit XXIV consists of the military judge's written findings
instructions provided to the members. The instruction of sexual harassment
the military judge intended to provide the members, and ultimately did provide
the members, stated:

27

> "Sexual harassment" means nonconsensual sexual advances and nonconsensual requests for sexual favors.[2] Other verbal or physical conduct of a sexual nature constitutes "sexual harassment" when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to, or rejection of, such conduct by an individual is used as the basis for employment decisions affecting such an individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

> To establish that "sexual harassment" occurred based on the nature of the working environment, the government must prove that the accused's actions created a working environment that was intimidating, hostile, or offensive when viewed objectively under all the circumstances.

During Rule for Courts Martial (R.C.M.) 802 discussions with counsel, before providing findings instructions to the members, trial counsel requested the military judge strike "nonconsensual" from his proposed instruction and substitute that word with "unwanted." The basis for trial counsel's request was the language of PE 13, *i.e.*, the excerpt from AFI 36-2706 (5 Oct. 2010), made no mention of "nonconsensual" conduct and referred to "unwanted" conduct in its definition of sexual harassment. To this the military judge responded, "[The AFI] that I'm not taking judicial notice of? That isn't the actual AFI version?" The military judge did not accept this proposed change and gave the instruction to the members as originally drafted.

## II. DISCUSSION

### A. Law

We review issues of legal sufficiency de novo. *United States v. Harrington,* 83 M.J. 408, 414 (C.A.A.F. 2023) (citing *United States v. King,* 78 M.J. 218, 221

---

[2] As is stated in the analysis, it is precisely this period after "favors" that creates one of the fatal flaws in this instruction. This period is crucial to the determination of legal sufficiency because the military judge has created a definition of sexual assault to provide to the members. When he then instructs on "[o]ther verbal or physical conduct of a sexual nature" he correctly associates that conduct with the qualifiers in (1)–(3). But having not also associated the conduct in his first sentence with the (1)–(3) qualifiers, he has fundamentally and fatally misinstructed the definition of sexual harassment and provided the members an option to convict Appellant on a theory of criminal misconduct for which he was not charged.

(C.A.A.F. 2019)). Our assessment of legal sufficiency is limited to the evidence produced at trial. *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "This deferential standard impinges upon the factfinder's discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Mendoza*, 85 M.J. 213, 217 (C.A.A.F. 2024) (internal quotation marks and citation omitted).

"The question of whether a jury was properly instructed [is] a question of law, and thus, review is de novo." *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (alteration in original) (citation omitted). "[A] military judge has wide discretion in choosing the instructions to give," if those instructions provide an "accurate, complete, and intelligible statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012) (citations omitted). While military judges have some discretion in tailoring panel instructions, a military judge has a "duty to 'provide appropriate legal guidelines to assist the jury in its deliberations.'" *United States v. Wolford*, 62 M.J. 418, 419 (C.A.A.F. 2006) (quoting *United States v. McGee*, 23 C.M.A. 591, 1 M.J. 193, 195, 50 C.M.R. 856 (C.M.A. 1975)). "Failure to provide correct and complete instructions to the panel before deliberations begin may amount to a denial of due process." *Id.* (citation omitted). R.C.M. 920(e) expressly requires that instruction on findings include, *inter alia*, "[a] description of the elements," and "[s]uch other explanations, descriptions, or directions as may be necessary and which are properly requested by a party or which the military judge determines, *sua sponte*, should be given." R.C.M. 920(e)(7).

Waiver does not apply to "required instructions." *United States v. Davis*, 53 M.J. 202, 205 (C.A.A.F. 2000) (quoting *United States v. Taylor*, 26 M.J. 127, 128 (C.M.A. 1988)). When, as here, an appellant "fails to preserve the instructional error by an adequate objection or request, we test for plain error." *United States v. Davis*, 76 M.J. 224, 229 (C.A.A.F. 2017). Having considered the test for plain error, I find the error of providing the wrong definition of the consequential element did amount to plain error. Where an instructional error raises constitutional implications, our superior court has traditionally tested the error for prejudice using a "'harmless beyond a reasonable doubt' standard." *United States v. Davis*, 73 M.J. 268, 271 (C.A.A.F. 2014) (quoting *Wolford*, 62 M.J. at 420). The test for determining if the error was harmless beyond a reasonable doubt is "whether, beyond a reasonable doubt, the error did not contribute to the [accused's] conviction or sentence." *United States v. Prasad*, 80

M.J. 23, 29 (C.A.A.F. 2020) (alteration in original) (quoting *United States v. Hills*, 75 M.J. 350, 357 (C.A.A.F. 2016)). When an appellate court is not confident that a constitutional error did not taint the proceedings, it should find prejudice. *See id.* "Whether the error is harmless beyond a reasonable doubt is a question of law that we review de novo." *United States v. Simmons*, 59 M.J. 485, 489 (C.A.A.F. 2004) (citation omitted).

## B. Analysis

My colleagues suggest the "primary evidentiary issue in this case centers upon whether the Government offered sufficient proof of a seemingly non-controversial fact: namely, that every Airman in the Air Force has a duty to abstain from sexual harassment of fellow Airmen in the workplace." This may be true, but the crucial defect in their position is that they address factual sufficiency without first addressing the importance of the military judge legally defining sexual harassment in the context of a criminal charge claiming dereliction of a duty not to sexually harass another. It is precisely this definition, which neither trial counsel, trial defense counsel, or the military judge could agree upon, that is the primary issue in this case. To argue Appellant knew what conduct constituted sexual harassment when the legal experts at trial grappled over the definition is inconsistent with a conclusion that the Government sufficiently proved beyond a reasonable doubt all elements of the offense as charged.

With respect to instructional error, which I find the errors in this case equate to a due process violation and legal insufficiency, my colleagues claim Appellant waived such error at trial by not objecting to the military judge's instructions. I do not agree as a correct instruction regarding what conduct constitutes—the definition of sexual harassment—was a required instruction in this case and waiver does not apply to required instructions. The military judge provided the panel members with a definition in his findings instructions. This instruction was inconsistent with every definition available at the time of the alleged conduct and by its terms changed the nature of the criminal conduct. It further contradicted the definition provided to the members in PE 13, and Attachment 1, which was not provided to the members, but which was addressed by the military judge during the court-martial. Effectively, the military judge provided the members an instruction which tasked them with deciding culpability on a theory with which Appellant was not charged such that no rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt.

Failure to provide correct and complete instructions to the members before deliberations begin may amount to a denial of due process. The military judge struggled with the partial definition of sexual harassment the Government of-

fered, which was found in PE 13. It is a partial definition because, as the military judge pointed out, "the excerpt that the [G]overnment [ ] provided has, in one of the relevant paragraphs, a reference [ ] to 'See Attachment 1 for full definition' and then there's no Attachment 1 in [PE 13]." The panel members never saw Attachment 1, yet Attachment 1 included a full definition of what the Air Force considered to be sexual harassment in this 2010 version of AFI 36-2706. Importantly, the definition in Attachment 1 of AFI 36-2706, which was based on Title VII of the Civil Rights Act of 1964, required conduct amounting to sexual harassment be directly tied to some negative effect on the job, pay, career, or workplace environment of the person harassed. This connection is necessary in order to equate one's conduct to criminal sexual harassment.

The military judge seemingly used the definition of sexual harassment in Attachment 1 to PE 13 as the basis or template for the findings instructions he drafted and ultimately provided to the members. Attachment 1 states in relevant part: "*Unwelcome* sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment *when* . . . ." AFI 36-2706 (5 Oct. 2010), Attachment 1 (emphasis added).

However, the military judge made two fatal changes to the wording and structure of the definition in Attachment 1 when drafting his instructions to members, which in relevant part read: "'Sexual harassment' means *nonconsensual* sexual advances and *nonconsensual* requests for sexual favors." (Emphasis added).

The instruction as drafted by the military judge is an incorrect statement of the law. First, when the military judge substituted "nonconsensual" from "unwanted," a change made even in light of the Government's strong objection to the changed language, he fundamentally changed the standard the members would use to determine Appellant's culpability. The military judge declined Government's request to use the language as set forth in statute and as reflected in Attachment 1 of the 2010 AFI ruling that "unwanted" is a lower standard than "nonconsensual," apparently justifying his decision to change the standard for the charged offense by strapping the Government with, in his opinion, a higher standard of proof.

I agree with Appellant that "unwelcome" and "nonconsensual" are not legally equivalent. Nonconsensual is a term used in sexual assault cases, not charges alleging criminal sexual harassment. Our superior court in analyzing alleged sexual harassment in the workplace has recognized that amongst military members there is a "wide variety of reactions to comments of a personal or sexual nature." *United States v. Brown*, 55 M.J. 375, 385 (C.A.A.F. 2001). When analyzing an Air Force regulation defining sexual harassment, the court focused on unwelcomed comments finding, "[I]t is necessary to examine the

nature of the interaction between the parties to the conversation[s] to determine whether the person making the remarks had a reasonable notice that the comments would be regarded as unwelcome . . . ." *Id.* They also recognized that "given the wide variety of personalities present in the service, co-workers may be offended from time to time by the behavior of their colleagues. But offensive conduct does not necessarily constitute criminal conduct." *Id.* In effect at the time of the charged offense, Article 93, UCMJ, 10 U.S.C. § 893, measured sexual harassment "by an objective standard." The court in *Brown* further found that the pamphlet at issue in *Brown* defining sexual harassment "appropriately sets a higher standard, requiring that the [unwelcome] conduct be so severe or pervasive that it creates a hostile work environment," clearly tying criminal sexual harassment to the work environment. *Id.* Simply put, an allegation of criminal sexual harassment requires a showing of "unwanted" conduct, not "nonconsensual" conduct and whatever the military judge's reasoning for changing the language in his instruction, it was improper.

Even more detrimental to a proper instruction on the definition of sexual harassment is when the military judge starts out his instruction on this issue with: "'Sexual harassment' means nonconsensual sexual advances and nonconsensual requests for sexual favors." This premature imposition of a period after "requests for sexual favors"—where there should have been a comma so that such conduct was necessarily tied to the qualifiers in (1)–(3), the essential elements that make such conduct sexual harassment—makes this even more problematic. This definition instructing the members that nonconsensual sexual advances and nonconsensual requests for sexual favors alone is enough to determine Appellant engaged in sexual harassment invited the members to convict Appellant of a crime for which he was not charged—namely sexual assault, pursuant to Article 120, UCMJ, 10 U.S.C. § 920.[3]

In this connection, the military judge provided an instruction on "reasonable mistake of fact," which has no applicability in a dereliction of duty for sexual harassment case and further confused the issues the members were tasked to decide. Further, trial counsel emphasized the military judge's mistakes and argued strenuously in favor of the military judge's instructions telling the members, "The judge instructed you that nonconsensual sexual advances and nonconsensual requests for services—requests for sexual favors, that's sexual harassment. That's one way that there could be sexual harassment." Indeed, the military judge did provide such instructions, but these instructions were

---

[3] Article 120(b), UCMJ, *Sexual Assault*, states that "[a]ny person subject to [the UCMJ] who . . . commits a sexual act upon another person . . . without the consent of the other person . . . is guilty of sexual assault and shall be punished as a court-martial may direct." 10 U.S.C. § 920(b)(2)(A).

an incorrect statement on the definition of sexual harassment and the law applicable to the Charge against Appellant amounting to a due process violation. This violation was not inconsequential as the military judge himself recognized when he opined, "I told them[, the members,] so many times that I instruct you what the law is," recognizing his instructions are paramount to the members decision making process.

Where an instructional error raises constitutional implications, our superior court has traditionally tested the error for prejudice using a "'harmless beyond a reasonable doubt' standard." *Davis*, 73 M.J. at 271 (C.A.A.F. 2014) (quoting *Wolford*, 62 M.J. at 420). The test for determining if the error was harmless beyond a reasonable doubt is "whether, beyond a reasonable doubt, the error did not contribute to the [accused's] conviction or sentence." *Prasad*, 80 M.J. at 29 (citation omitted). In this case, where the military judge crafted an instruction that invited the members to convict Appellant on an uncharged theory, namely Article 120 sexual assault, which improperly divorced the sexual advances or requests for sexual favors from the required element of affecting one's job, employment, or career development, rather than on the basis of the actual charged offense, such instruction created a due process violation. Switching "unwanted" for "nonconsensual" further confused the theory of the offense upon which the members were instructed. One cannot say the instructional errors did not improperly contribute to Appellant's conviction, possibly on an uncharged theory. I am not confident that a constitutional error did not taint the proceedings and thus, I find prejudice. *See id.* at 29. Under the circumstances of this case, I find the instructional error was a due process violation which was not harmless beyond a reasonable doubt and rendered Appellant's conviction legally insufficient.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court